## MOORE v. FRIGIDAIRE CORPORATION et al. *
### No. 9721.

Circuit Court of Appeals, Eighth Circuit.
June 12, 1934.

*Rehearing denied September 14, 1934.

of Chicago, which were equipped with the accused device.

The first question to be determined is that of infringement. The patent to Blackmore was issued on February 7, 1928, on an application filed June 15, 1922, and claims 1, 2, 3, 5, 6, 9, 10, and 11 are involved in this suit. The patent to Summers was issued on August 18, 1931, on an application filed May 30, 1928, and claims 1, 13, 14, 15, 19, and 21 are in suit.

Electric refrigerators of the household type are equipped with an automatic regulator responsive to the temperature of the refrigerating chamber and so arranged and adjusted that it cuts in an electric switch, causing the refrigerating machinery to operate when a predetermined high temperature has been reached, and to continue to operate until the temperature has fallen to a predetermined point, when the regulator cuts out the switch, causing the machinery to stop. Thus the operating mechanism works intermittently and maintains a relatively constant temperature in the refrigerator within a predetermined range. This range is that of normal operation, and the adjustment of the thermostatic control mechanism which determines the temperature range of normal operation is called the factory adjustment or factory setting. Too low or too high a temperature in a refrigerator means unsatisfactory refrigeration, and the manufacturer is therefore interested in so adjusting the normal temperature control mechanism as to produce a range which will mean satisfactory operation to the user. The means whereby the refrigerating mechanism is started and stopped consists ordinarily of a drum-shaped sylphon or expansible metal bellows filled with a volatile liquid which expands with heat and contracts with cold. The extent of the expansion of the bellows depends upon the exterior pressure which is placed upon the bellows. This is well illustrated by patent No. 1,478,421 granted December 25, 1923, to Bechtold and Mellowes, which is owned by the plaintiff Frigidaire Corporation and embodied in refrigerators made by it. This patent shows a device whereby the exterior pressure upon the bellows is obtained by the use of a weighted lever-arm fulcrumed or pivoted upon the bellows, the extent of the pressure thereon being determined by the point on the weight-arm at which the weight is fixed. The weight can be adjusted at any point upon the arm, and the pressure upon the bellows can thus be changed by moving the weight on the arm either toward or away from the bellows. Moving the weight toward the bellows reduces the

Albert F. Mecklenburger, of Chicago, Ill. (George W. Hansen and Sidney Neuman, both of Chicago, Ill., on the brief), for appellant.

Drury W. Cooper, of New York City (George H. Strickland, of Dayton, Ohio, and W. P. Bair, of Des Moines, Iowa, on the brief), for appellees.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

SANBORN, Circuit Judge.

This appeal is from a decree in favor of the plaintiffs (appellees) in a suit brought for the alleged infringement of letters patent No. 1,658,323 to Lloyd Blackmore and letters patent No. 1,819,979 to Otto M. Summers, both of which relate to temperature control for electric refrigerators. The defenses are noninfringement and invalidity of the patents in suit. The patents belong to the Frigidaire Corporation, and the Penn Electric Switch Company is its licensee. The defendant is a dealer who sold electric refrigerators manufactured by the Grigsby-Grunow Company,

pressure, while moving it away increases it. As the bellows expands with the heat of the refrigerating chamber, it raises the weight-arm until it reaches a point where it cuts in the switch which starts the refrigerating machinery, and the refrigerating machinery then operates until it reduces the temperature to a point where the contraction of the bellows lowers the weight-arm, which cuts out the switch and causes the machinery to stop. The adjustment for normal operation is made at the factory, and the weight is there fastened to the weight-arm and is not to be disturbed except under the supervision of an expert.

It was discovered that, while it was desirable to leave the factory adjustment undisturbed, it was also desirable to provide some means whereby a housewife who desired to secure temporarily a lower temperature than normal might modify the factory adjustment in such a way that the refrigerating mechanism would operate and would continue to operate, until restored to normal, at a lower range of temperature than that provided by the factory. Blackmore directed his attention to this problem. While he does not limit himself to the Bechtold and Mellowes device, he uses it as illustrating his method of cold control for a refrigerator. What he sought was a simple means of permitting a temporary modification of the normal temperature range without disturbing the factory adjustment, and which would permit a return to normal operation as soon as the temporary demand for the lower temperature range had ceased. There were, of course, several obvious ways by which a lower temperature than normal could be secured, since it was well understood in the art that a reduction of the pressure upon the bellows would cause the refrigerating mechanism to operate within a lower temperature range. Moving the weight toward the bellows would reduce the pressure, but it would also disrupt the factory adjustment, and, unless the weight was returned to the exact position which it formerly occupied, the usefulness of the refrigerator would be impaired. To lighten the weight by removing a portion of it or to provide means for lifting a part of the weight would serve the same purpose. Blackmore's scheme was to add auxiliary means whereby, from the exterior of the refrigerator, one could modify or affect the normal operation of the automatic control. Blackmore placed in a convenient position on the exterior face of the refrigerator a handle or knob attached to a shaft which passed through the outer wall. To the interior end of the shaft was attached an arm, and to the end of the arm a coil spring, the lower end of which was fastened to the outer end of the weight-arm. When the knob or handle was in the off position, the spring was not at tension and exerted no effect whatever upon the weight-arm and hence no effect upon the normal operation of the automatic control. However, as the handle or knob was turned away from the off position, the spring was tensed and exerted a lifting pull upon the weight-arm, thereby reducing its pressure upon the bellows and permitting the refrigerating machinery to operate at a lower temperature range. When the handle or knob was restored to the off position, the auxiliary means became inoperative and the normal range of temperature was restored. Everything used by Blackmore to produce his desired result was old. The result was due to a combination of old elements. This combination is described in claim 1, as follows: "Refrigerating apparatus comprising, in combination, a cabinet, a cooling unit within said cabinet, means for circulating a refrigerant medium through said unit, control means for automatically controlling said apparatus, said control means having adjustable means for regulating same for normally maintaining a predetermined temperature condition of said cooling unit, auxiliary means within the cabinet for temporarily modifying the operation of the first means to obtain temporarily a different temperature in the cooling unit, and means extending through a wall of said cabinet and associated with said auxiliary means for controlling the latter."

Summers in effect reproduced Blackmore, but added one additional element; a defrosting arrangement. It was known that, after a certain period, the cooling unit became covered with frost, which affected its efficiency, and it was Summers' purpose to provide a simple and efficient refrigerating apparatus switch control which could not only be used for the same purpose as the Blackmore device, but could also, by holding open the switch, be used for temporarily cutting out the refrigerating mechanism, so that the temperature in the refrigerator would rise to a point where frost would be melted.

Summers, in illustrating his device, did not use the weight and weight-arm of Bechtold and Mellowes, but used its equivalent, namely, an arm pivoted upon the bellows, the pressure of the arm being controlled by adjustable springs attached to the arm, which serve exactly the same purpose as a weight. His method of securing a temporary modification of the normal temperature was not by adjusting the tension of the springs which regulated the normal temperature range. He,

like Blackmore, provided an auxiliary arrangement whereby, through a knob or handle on the outside of the refrigerator, another spring could be brought into play which exerted a lifting tendency upon the lever arm controlling normal operation. When the knob or handle was turned past a certain point, the refrigerating machinery would be cut out entirely, for the purpose of defrosting. By turning back the handle to the off position, the auxiliary spring became again inoperative, as in Blackmore, and the refrigerator was restored to its normal temperature control. It will thus be seen that in neither Blackmore nor Summers is there any suggestion that a temporary modification of the temperature can be or should be secured through either moving the weight-arm of Bechtold and Mellowes or changing the adjustment of the springs which control the normal pressure upon the bellows in the Summers patent. In fact, the teaching is that the auxiliary control should not disturb the setting of the normal control. The accused device accomplishes exactly the same result as Blackmore and Summers, but, instead of using the weight-arm and weight of Bechtold and Mellowes or the pivoted spring-pressed arm of Summers, a spring is used to press directly against the bellows, which, of course, serves exactly the same purpose. The accused device, however, does not contain any independent auxiliary means, such as Blackmore or Summers used, for securing an abnormal temperature range. The means which is provided for securing temporarily a temperature below normal consists of a device for directly changing the factory adjustment. The pressure of the spring which will produce the normal temperature range is regulated by a screw which holds a washer against the spring and thus controls its tension. By turning this screw the tension can be increased or diminished. A knob or handle with a shaft attached is passed through the exterior wall of the refrigerator and is fastened with a collar to the squared head of the screw. When the handle is in a certain indicated position the refrigerator operates at its normal temperature range. When the handle is turned in a clockwise direction it turns the screw and reduces the tension on the spring so that the refrigerating mechanism operates at a lower temperature. When it is turned back to its original position, normal conditions are restored, and when it is turned in a counter clockwise direction and to the defrost position, it stops the operation of the refrigerating mechanism entirely by opening a switch which can only be closed by means of a resetting button. What the defendant does with respect to cold control is the exact equivalent of moving the weight upon the weight-arm of Bechtold and Mellowes or adjusting the tension of the normal temperature control springs of Summers. If the claims of Blackmore are not limited to his auxiliary means for modifying the pressure upon the bellows, and if the same is true of Summers, and if the claims of both these patents are broad enough to cover means whereby pressure is relieved by moving the weight on the weight-arm of Blackmore or adjusting the springs which serve the same purpose in Summers, then the accused device infringes the claims of these patents.

The plaintiffs contend that Blackmore was the first person to conceive the idea that the interior temperature of a refrigerator might be influenced by an exterior knob or handle, and that the patent is in a sense a pioneer patent. It had been known for years, however, that mechanism inside of a box or cabinet could be affected by a knob or handle on the outside. The knob and dial of the ordinary safe would perhaps be an illustration. What the defendant claims is that, although Blackmore and Summers show means for modifying the pressure upon the bellows from the exterior of the cabinet, their claims were limited to their own peculiar means and did not cover anything more than those means or their substantial equivalents, while the accused device, in accomplishing the same purpose, does not accomplish it in the same way, and leaves out entirely one element of the Blackmore and Summers combination; namely, the independent auxiliary means for affecting a fixed normal control mechanism.

So far as the Blackmore patent is concerned, the vital question in this case seems to be: Did the defendant, when he passed the shaft through the exterior of his refrigerator and fastened it to the screw-head which controlled the tension of the spring which pressed against the bellows, and when he provided a knob at the other end of the shaft so that the pressure upon the bellows could be manually controlled from the exterior of the refrigerator, trespass upon the patent rights of Blackmore?

In order to determine what these rights were it is necessary first to examine the file wrapper history of the patent.

The application was filed almost six years before it was granted. As originally filed it contained ten claims. Original claim

8 indicates the scope of the claims as first filed. It reads as follows: "In a refrigerator, in combination, a cabinet, a mechanical refrigerating unit enclosed therein, temperature responsive means for controlling the operation of the refrigerating unit, and means extending to the exterior of the cabinet for regulating said first mentioned means."

This original claim clearly reads upon the defendant's device and is broad enough to cover any external means for controlling the operation of the refrigerating unit.

All of the ten original claims were rejected; claim 8 "on the Bechtold patent for the reason that it would not involve invention to provide a switch on the outside of the refrigerator in view of the Wolf patent."

Blackmore acquiesced in the rejection of the claims, and substituted fifteen new claims, of which claim 10 is fairly typical: "In a refrigerating apparatus including a cabinet and mechanism for producing refrigeration therein; control means for automatically controlling said mechanism for maintaining the temperature within said cabinet within predetermined limits, said means including an operating member, and a resistance means for said operating member; and spring means cooperating with said member for modifying the action of said control means to cause operation of the mechanism between other temperature limits."

With respect to the new claims, Blackmore's counsel stated in his letter to the Examiner: "As now drawn the claims clearly distinguish the present invention from the references of record. Applicant's construction comprises generally a refrigerating apparatus having means responsive to conditions within the refrigerator cabinet for automatically maintaining the temperature therein within predetermined limits. In order to produce abnormally low temperatures as when it is desired to make ice quickly, applicant has provided an additional manual control which may be set to impose its effect on the first control so as to continue the motor in operation for a longer period than usual, thereby producing lower temperatures. The manual control operates in conjunction with the automatic control to modify its action, but it does not render the automatic control inoperative."

And, in referring to the patent to Knox, cited by the Examiner, Blackmore's counsel stated: "This switch is but a single control means, and there is no second control means as in applicant's construction for temporarily modifying the operation of the first control means."

All of the substituted claims, except claim 14, were rejected by the Examiner; some of them in view of Bechtold and Mellowes No. 1,478,421. Obviously, the Examiner was of the opinion that to provide means for moving the weight of the Bechtold and Mellowes patent to modify the pressure on the sylphon bellows would not constitute invention, for he says: "The weights * * * are adjustable whereby the action of the controlling means may be temporarily modified."

Claim 14, which was held to be allowable (as amended, now claim 6 · of the patent), reads as follows: "In a refrigerating apparatus including a cabinet and mechanism for producing refrigeration therein; control means for automatically controlling said mechanism for maintaining the temperature within said cabinet within predetermined limits, said means including an operating member, and a resistance means for said operating member; and means cooperating with said member for modifying the action of said control means to cause operation of the mechanism between other temperature limits, said last-mentioned means comprising a resistance device connected with the operating member, and means operable from the exterior of the cabinet for regulating the effect of said resistance device."

It appears that claim 14 was considered allowable because it provided additional means for modifying the action of the normal control means, and because it was not regarded as the equivalent of adjusting the weight of the Bechtold and Mellowes patent.

After the rejection of all claims except claim 14, Blackmore filed amendments to his claims to show that the means for modifying the automatic control were auxiliary means. In submitting these amendments, counsel for Blackmore stated in his communication to the Examiner: "The present invention is, of course, a clear departure from anything disclosed in the references. There is nothing in the prior art to suggest a refrigerating apparatus having control means for normally controlling the temperature or operation of the device between certain limits, in combination with . other means for temporarily causing the refrigerating mechanism to operate between other limits of temperature for the purpose, for example, of quickly freezing desserts and the like.

According to the present invention the auxiliary means for modifying the normal control of the refrigerating mechanism is so constructed and arranged that it may be made effective at any time and likewise may be rendered ineffective at any time, the normal control means being automatically restored to its previous condition of control."

Again, all of the claims except 6, 7, and 14 (claims 6 and 7, as amended, are now respectively claims 4 and 5 of the patent) were rejected. In response to this action of the Patent Office, Blackmore canceled all of the claims in his application except the three allowed, and submitted six new claims. In presenting these new claims, counsel for Blackmore stated that they "provided a temperature-responsive means which normally maintains the temperature of the cooling unit at a certain value," and "auxiliary means which modifies the operation of the compressor in order to obtain a different temperature in the cooling unit." The Examiner then officially allowed the Blackmore application, but, on September 2, 1926, he asked that the same be withdrawn from issue and restored to his jurisdiction for the purpose of rejecting all of the claims on the newly discovered patent to Singer, No. 577,-328. Thereupon the Examiner cited the Singer patent and rejected all claims except three, which are claims 4, 5, and 6 of the (Blackmore) patent. In his letter the Examiner said: "Attention is called to page 2, lines 77-125 of the Singer patent in which is clearly described a by-metal thermostat with means for adjusting the distance between the contact points to thereby change the temperatures between which the refrigerating machine operates. Note also that a wire or rod 17 is connected at one end to the adjusting an auxiliary means and at the other to an indicator dial situated on the outer face of the refrigerator wall. Obviously, operating the dial would operate the auxiliary means."

He further states: "Claims 3, 8 are also rejected on the Singer patent the rod and dial constitute means operable from the outside of the cabinet."

The Examiner thus makes it plain that the Patent Office did not regard the furnishing of means to control the automatic temperature regulator from the outside of the cabinet invention in view of Singer, but that it did consider the auxiliary means for modifying the action of the regulator as distinguishable from Singer. Thereupon Blackmore amended his claims and added others for the purpose of distinguishing his invention from that of Singer, and his counsel in his letter to the Examiner, submitting the amendment, says: "It is apparent from the Singer disclosure that the patentee did not have the fundamental idea of the control system for refrigerating apparatus in which normally a predetermined temperature is maintained and in which the temperature can be temporarily modified without disrupting the setting of the normal control. In applicant's device it is merely necessary to actuate the lever 30 to obtain temporarily a different temperature and when the lever is restored, the control mechanism 16 will function, without readjusting same, to provide normal temperatures. While in the Singer structure, if the lever 16 is manipulated for obtaining a different temperature it will become necessary to reset the control in order to obtain normal temperatures. The manual control in the Singer construction is similar to applicant's weight 21 and therefore he does not show an auxiliary control means, as brought out in the claims, which may be utilized for temporarily obtaining a different temperature."

The nature of the device illustrated by the Singer patent can be gathered from lines 77-125 on page 2 of the patent. Singer says:

"In a system of the kind described it is necessary at some point to control the motive power or to provide means whereby it may be controlled by a skilled person having charge of the system. This is necessary as well to maintain the proper amount of refrigeration as to prevent any waste of energy. For this purpose of automatically regulating the motor H, I provide a thermostat 6, which is located upon one of the walls of the interior of the refrigerator. This thermostat may be of any of the well-known constructions which may be found to be adapted to the purpose. In the present instance, however, I have shown a thermostat consisting of two strips of metal, one of the strips being of steel, the other of brass. These strips are bolted or otherwise secured together through their entire length and are bent in the arc of a circle with the steel strip on the inside. To one end of the strips thus united is connected a wire 7, which extends to one pole of the dynamo or battery, and from the opposite ends of the strips a wire 8 extends to the motor, thence through the motor to the other pole of the battery or dynamo, and thence from the battery to the strip 9, carrying at its free end contact-points 10, as shown.

"11 is a lever secured at one of its ends to a bolt 12, located at one side of the center of the thermostat 6. The said lever 11, secured at its free end to a rubber block 13, is adapted to, upon the movement of the said lever, contact with the inner face of the coiled metal strips of the thermostat, and thus expand the diameter of the same or allow the same to contract, as the case may be, thus regulating the distance between the free ends of the same, as will be readily understood.

"Located upon the outside of the refrigerator-case at a point directly above the plane upon which the thermostat is placed, is an indicating-dial 14. Upon the inner end of the shaft 15, connecting the center of the dial with the interior of the refrigerator, is an arm or lever 16, connected by a rod or wire 17 with the arm 11 of the thermostat, and upon the other face of the dial on the shaft 15 is an indicating-pointer 18."

The plaintiffs now contend that the Singer patent should not have been cited by the Examiner as an anticipation of Blackmore's claims, because of its imperfections. It would seem to be unimportant whether Singer's device was operable or not or whether the patent should have been cited or not. It was, as a matter of fact, cited as a reference against the Blackmore claims, and Blackmore saw fit to write his claims around it, and therefore relinquished so much of his invention, if any, as was claimed by the Patent Office to have been shown by Singer. From the file wrapper history of the Blackmore patent, it seems apparent that the invention did not cover any direct method or means of modifying or changing the normal temperature range of a refrigerator by adjusting the normal temperature regulator, as was done by Singer or as would be done by any one who moved the weight of the Bechtold and Mellowes device or adjusted the tension of the normal control springs of the Summers device. Blackmore limited himself to auxiliary control means, disassociated from the normal control mechanism except when co-operating therewith to secure an abnormally low temperature, and even then leaving undisturbed the normal or factory setting of such mechanism. In other words, Blackmore's scheme contemplated no change in the setting of the automatic control means, but added an additional means whereby a lower temperature might be temporarily secured without in any way disturbing the adjustment essential for normal operation. Blackmore, having narrowed his invention for the purpose of securing the allowance of his application, the plaintiffs cannot now expand it for the purpose of this suit.

The Supreme Court of the United States, in I. T. S. Rubber Company v. Essex Rubber Co., 272 U. S. 429, 443, 47 S. Ct. 136, 141, 71 L. Ed. 335, said: "It is well settled that where an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot after the issue of the patent broaden his claim by dropping the element which he was compelled to include in order to secure his patent. Shepard v. Carrigan, 116 U. S. 593, 597, 6 S. Ct. 493, 29 L. Ed. 723. If dissatisfied with the rejection he should pursue his remedy by appeal; and where, in order to get his patent, he accepts one with a narrower claim, he is bound by it. Shepard v. Carrigan, supra [597 of 116 U. S., 6 S. Ct. 493]; Hubbell v. United States, 179 U. S. 77, 83, 21 S. Ct. 24, 45 L. Ed. 95. Whether the examiner was right or wrong in rejecting the original claim, the court is not to inquire. Hubbell v. United States, supra [83 of 179 U. S., 21 S. Ct. 24]. The applicant having limited his claim by amendment and accepted a patent, brings himself within the rules that if the claim to a combination be restricted to specified elements, all must be regarded as material, and that limitations imposed by the inventor, especially such as were introduced into an application after it had been persistently rejected, must be strictly construed against the inventor and looked upon as disclaimers. Sargent v. Hall Safe & Lock Co., 114 U. S. 63, 86, 5 S. Ct. 1021, 29 L. Ed. 67; Shepard v. Carrigan, 116 U. S. 598, 6 S. Ct. 493, supra; Hubbell v. United States, 179 U. S. 85, 21 S. Ct. 24, supra. The patentee is thereafter estopped to claim the benefit of his rejected claim or such a construction of his amended claim as would be equivalent thereto. Morgan Envelope Co. v. Albany Paper Co., 152 U. S. 425, 429, 14 S. Ct. 627, 38 L. Ed. 500."

See, also, R. H. Buhrke Co. v. Brauer Bros. Mfg. Co. (C. C. A. 8) 33 F.(2d) 838; Buchanan et al. v. Wyeth Hardware & Manufacturing Co. (C. C. A. 8) 47 F.(2d) 704; Teigen et al. v. United Cigar Stores Co., etc., (C. C. A. 8) 62 F.(2d) 5; Smith, Adm'x, v. Magic City Kennel Club, Inc., 282 U. S. 784, 789, 790, 51 S. Ct. 291, 75 L. Ed. 707.

Our opinion is that the accused device follows the disclosure of Singer, rather than that of Blackmore, and omits an element of

the Blackmore combination, namely, the auxiliary control means which Blackmore and the Patent Office regarded as essential in order to distinguish his invention from that of Singer, and that therefore the accused device cannot be held to infringe the claims of the Blackmore patent.

Since the defendant was free to utilize the method and means of the accused device to secure cold control in his refrigerator, the question arises whether he might add to his mechanism his defrosting means without infringing the claims of the Summers patent. We think that very little patentable novelty can be accorded to Summers, in view of the prior art. What he did was to devise a mechanically compact and efficient unitary switch mechanism for the temperature control of electric refrigerators, which utilized the exterior knob or handle not only to operate the auxiliary cold control mechanism, but also to perform the additional function of blocking out the automatic switch entirely, when it was desired to melt the frost from the refrigerating unit. The cold control was separate and distinct from the defrosting mechanism, except in the sense that the same knob or handle which regulated the one also operated the other. It was evidently assumed that Summers, by adding to the invention of Blackmore a defrosting device, and including in a single unit the normal control, the Blackmore auxiliary control and the defrosting arrangement, created a patentable combination, although it may be doubtful whether this was anything more than an aggregation of old elements, since there would seem to be no invention in providing an independent means for defrosting, although the same handle was used to control the temperature and to operate the defrosting mechanism. "A handle in common, a joint handle, does not create a new or combined operation." Reckendorfer v. Faber, 92 U. S. 347, 356, 23 L. Ed. 719.

The mechanism provided by Summers for blocking out the automatic switch does not co-act with the mechanism which produces the cold control, in the sense that a combined result is obtained, and each performs an independent function to the same extent as though two handles were used instead of the one. By turning the handle of Summers to a certain point, cold control is secured; by turning it beyond that point, cold control ceases and the handle operates a defroster.

The file wrapper history of the Summers patent indicates that he had in mind a combination, one element of which was the Blackmore invention, because, in distinguishing his invention from the prior art, he says: "Applicant is the first to provide such a (defrosting) device in combination with the temperature adjustment which is independent of the normal or 'factory' adjustment."

Assuming the validity of the Summers patent, we think that he is limited to a very narrow range of equivalents, and that any substantial departure from his specific device would avoid infringement.

The means which the defendant uses to secure defrosting are not identical with those of Summers. There is no blocking-out arm to cut out the switch and thereby render the refrigerating mechanism inoperative. The defendant provides an additional switch which is opened by turning the cold control knob in a counter clockwise direction, the switch remaining open until reset by pressing a separate button. The turning of the knob of the defendant's device without resetting does not close the switch, and, in order to return to normal operation, it is necessary to reset and also to turn the knob away from the defrost position.

In our opinion, the defendant, instead of adding to the Blackmore combination the resetting device of Summers, has added his own defrosting device to his own cold control combination.

We think that that did not constitute infringement of the Summers patent, but was a mere addition of an old element to a nonpatentable combination, which created no new combined result, but produced two separate results, namely, cold control and defrosting.

We hold that the accused device does not infringe the claims of the patents in suit as limited by the prior art, and as they must be read in view of the proceedings in the Patent Office. It is not necessary, therefore, to express any opinion as to the validity of either patent.

The decree is reversed, and the case remanded, with directions to dismiss the bill.