## SMITH v. MID–CONTINENT INV. CO.
### No. 11239.

Circuit Court of Appeals, Eighth Circuit.
Sept. 12, 1939.

Rehearing Denied Oct. 9, 1939.

WOODROUGH, Circuit Judge, dissenting.

Langdon Moore, of Chicago, Ill., for appellant.

Elton L. Marshall, of Kansas City, Mo. (Henry N. Ess and Watson, Ess, Groner, Barnett & Whittaker, all of Kansas City, Mo., on the brief), for appellee.

Before STONE, WOODROUGH, and THOMAS, Circuit Judges.

624

STONE, Circuit Judge.

This is an appeal from an adjudication of infringement of Cross patent No. 1,758,146 covering a "domestic heating system", applied for November 11, 1926, and issued May 13, 1930.

Defendant (appellant) did not rely upon invalidity of the patent because of anticipation or prior publication. The two defenses were (1) that there was no infringement and (2), if the patent claims read upon the accused device, the patent is invalid as being an "aggregation". Appellant argues here the further matter of "paper patent".

## 1. Infringement.

The accused construction and the commercial construction of plaintiff are so alike that no point is made of any difference to avoid infringement. Defendant's position is that plaintiff's commercial construction is outside the patent. Therefore, the contest is whether the patent is broad enough to cover the commercial construction. This question is one of the scope of the patent.

What is meant (in a legal sense) by the "scope" of a patent? A general definition may well be that the scope of a patent is the boundaries (or limits) of the invention protected by the patent. Such boundaries never are and never can be defined in that definite sense which we employ in thinking of physical things—they are not matters of metes and bounds. They are determined by the application of certain methods which are based upon established principles of patent law.

One method is based upon two closely related principles. The first of these principles is that the inventor can claim as invention only so much as he reveals, in the patent, as his discovery. This is so because one price the inventor pays for his monopoly against the public is that, after the term of the patent expires, the public will be able to utilize the discovery. The second is that, within such revealed discovery, the monopoly given him is only such as he claims for himself. This is so because an inventor is not required to, and sometimes does not wish to, exclude the public from the free useful benefit of any or of all of his discovery. Thus while it is his privilege to claim all that he has discovered his right to protection extends only to what he actually claims for himself. What he has discovered is revealed in the drawings and specifications of the patent. What, of that discovery, he is entitled to keep for himself is revealed in the claims of the patent. The application of the method comprehending these two principles is a matter of the construction of the bare patent paper itself by one skilled in the art.

A second method is by inspection of the file wrapper. This is so because such inspection may reveal that the invention claimed in the patent has been limited in the Patent Office and such limitation accepted by the patentee in order to procure the patent. To allow the language of a patent to include any of such excluded portion would be to extend the contract and grant in the patent beyond the true intendment of the parties thereto. This is really an application of the doctrine of estoppel.

A third method is by examination of the prior art. This is so because the prior art is a field not open to discovery. Novelty, justifying a patent, must be found outside that field. No matter what the discovery asserted or claimed in the patent, such assertion or claims must be construed to be limited so as to exclude the prior art. In questions of the *scope* of a patent, the place of the prior art is to determine the "range of equivalents" to be applied. If the discovery revealed and claimed is in a new field of endeavor or is a pronounced journey forward in an art, then the claims are entitled to be liberally construed, resulting in a wide range of equivalents; but if the discovery is in a crowded art and is merely a mincing step forward, the claims are restricted to a narrow range to avoid trespass upon the domain of others or of the public. McKays Co. v. Penn Elec. Switch Co., 8 Cir., 60 F.2d 762, 766.

Appellant contends that this patent is narrowly limited by the language of the patent, by the file wrapper, and by the prior art. These limitations urged are as to a specific element of the patent—the location of a particular thermostat. To understand what this element is and its controlling importance on the issue of infringement, a statement of the situation is required.

The patent is concerned with a domestic heating unit, such as for a dwelling, using "comminuted fuel, such as disintegrated

coal".[1] The novelty asserted has to do with the automatic control of the fire in the furnace. This control comprehends two thermostats. One of these is located in the space to be heated (as a room in the house) and is designed to keep the heat therein within certain determined limits by increasing or decreasing the furnace heat through control of the fuel feed to the furnace. The other thermostat is designed to prevent the furnace fire from going out during extended periods of mild weather and thus maintaining a fire subject to the room thermostat control. The location of this latter thermostat is the element here involved.

In plaintiff's commercial structure, this thermostat is placed in the "breeching" of the furnace, which is a by-pipe connected at one end to the furnace and at the other to the portion of the flue extending from the furnace to the chimney. That is, also, the location of a similarly functioning thermostat in the accused structure. Appellant contends that such location is not within the patent because, he says, the patent locates the thermostat inside of the fire-pot of the furnace. Therefore, the issue as to scope of the patent comes down to whether the location of this thermostat is confined to the fire-pot. Appellant urges such restriction is necessitated by the patent itself, by the file wrapper, and by the prior art.

*The Patent.* As originally filed, the application contained disclosure and claims covering two asserted novel features—one having to do with the furnace construction and one with the furnace control. On division required in the Patent Office, the claims as to furnace and those as to control were separately prosecuted. This patent is concerned with the control. This control is described as a "dual control". Obviously, the prime purpose is the control of heat in the space intended to be heated by the furnace, that is, the rooms of the house. This is brought about by control of the fire in the furnace which provides such heat. The primary control is through the thermostat placed in one of the rooms to be heated—this thermostat governing the maximum and minimum heat requirements of the room. The secondary control is for the purpose of maintaining the fire in the furnace so that it may be always available and subject to the action of the room thermostat. Each of these thermostatic controls operates electrically—operating independently of each other through wiring in series. This general purpose is stated in the specifications (p. 1, 11. 18-25; p. 3, 11. 53-58).

Turning now to the method revealed for accomplishing the above dual control. Each of these controls being actuated by a thermostat, the particular thermostat is made subject to the temperature at a certain place. Our concern is with the location of the thermostat to keep the fire alive. The specifications teach that this thermostat is to be influenced by the temperature in the furnace (p. 1, 1. 25; p. 2, 11. 26-27, 36, 43, 110; p. 3, 11. 4-5, 14-15). The specifications and drawings place this thermostat in the "combustion space of the furnace, just above the fire zone" (p. 2, 11. 26-27; Figs. 1 and 2) or "within the combustion pot" (p. 3, 11. 3-4). Of the five claims[2], claims 1 and 2 place this thermo-

---

[1] In considering this patent—particularly as affected by the prior art—it is important to bear in mind the character of the fuel involved and that an *automatic* fuel is to be used. This patent is concerned with disintegrated coal. Other patents cited are confined to oil or gas as fuel. This difference in character of fuel to be automatically controlled is significant in connection with the problem of preserving fire. In oil and gas feeds, the oil or gas is entirely cut off when heat is not needed. In such feeds, the fire is preserved by a pilot flame which operates to ignite the oil or gas when it begins to flow—thus a fire condition is preserved. When coal is the fuel, the problem of fire preservation is so to regulate the automatic feed as to keep sufficient coal in the furnace ignited to kindle a greater fire when needed.

[2] The five claims are as follows:

"1. A heating system comprising a combustion pot, means for feeding fuel thereto, a combustion space above the combustion pot, means controlled by the temperature of the rooms to be heated for automatically regulating the fuel feeding means, and a separate thermostatic control actuated by predetermined minimum temperatures in said combustion space for preventing extinguishment of the fire when operating under low heat requirement conditions.

2. A heating system comprising a combustion pot, means for feeding fuel thereto, a combustion space above the combustion pot, means controlled by the temperature of the rooms to be heated for turning on and off the feeding means, and a separate thermostatic control actuated by a predetermined minimum tempera-

stat where it will be actuated by predetermined minimum temperature "in said combustion space", meaning "a combustion space above the combustion pot"; claim 3 covers actuation by minimum temperature "in the combustion space", meaning "a combustion space heated by said combustion pot"; claim 4 covers actuation by minimum temperature "of the combustion space", without definition of such "combustion space"; claim 5 covers actuation by predetermined minimum temperature "within the furnace", without definition of "furnace".

In construing these revelations and claims, we must view them with the knowledge of one skilled in the art—such knowledge to be found in the evidence and in such common experience as courts may judicially notice. So viewed, we conclude as follows. The broad idea revealed in the specifications is that of a dual thermostatic control of an automatically fed domestic coal burning furnace. One of such controls is for the purpose of keeping the fire alive. It is obvious that such location of this thermostat must be close enough to the fire in the furnace so that it will be affected by the necessary minimum temperatures in time to operate to save the fire. The drawings show location in the fire-pot just above the fuel level. One expression in the specifications places the thermostat in the furnace "just above the fire zone" (p. 2, 1. 27), thus following the drawings. Another expression places it

"within the combustion pot" (p. 3, 11. 3-4) which would cover any location within the combustion pot. Other expressions voice the general requirement that the temperature of the furnace is the influencing medium. The evidence is undisputed that the temperature of the furnace is, in a thermostatic sense, only slightly less effective in the breeching pipe than in the furnace itself—being the temperature passing immediately out from the fire-pot. To one skilled in the art, it would be obvious that a thermostat would, for all practical purposes, work as efficiently in the breeching to preserve the fire as it would located anywhere in the furnace proper[3]. Thus the revelation to—the education of—one skilled in the art who might study the drawings and specifications would be that this element of the dual control would be workable in the furnace proper or in the close exit of heat therefrom but that the patentee preferred location just above the fire zone or at least within the furnace itself. It is a principle of patent law that a "change of location of an element in a combination, if the function remains the same, will not avoid infringement" (United States Ozone Co. v. United States Ozone Co. of America, 7 Cir., 62 F.2d 881, 889) and the "particular forms of devices described in the specifications are to be considered as merely forms of devices preferred by the inventor." McDonough v. Johnson-Wentworth Co., 8 Cir., 30 F.2d 375, 384.[4] Thus the teachings of the draw-

ture in said combustion space for preventing extinguishment of the fire when operating under low heat requirement conditions.

3. A heating system of the character described comprising a combustion pot, means for feeding fuel thereto, means for forcing air to said combustion pot, means controlled by the temperature of the rooms to be heated for automatically turning on and off the fuel feeding means and the air forcing means, a combustion space heated by said combustion pot and a separate thermostatic control actuated by a predetermined minimum temperature in the combustion space for preventing extinguishment of the fire when operating under low heat requirement conditions.

4. A domestic heating plant of the character described comprising a combustion pot, an automatic stoker adapted to supply fuel thereto, means controlled by the temperature of the rooms to be heated for turning on and off the stoker, and a separate thermostatic control ac-

tuated by the predetermined minimum temperature of the combustion space for preventing extinguishment of the fire when operating under low heat requirement conditions.

5. A force draft furnace for a heating system having a power driven underfeed stoking element, a dual thermostatic control mechanism connected to the stoker driving means, one thermostat mechanism functioning by variations of the temperature in the space to be heated, and the other by predetermined minimum temperature within the furnace to prevent extinguishment of the fire."

[3] The expression "furnace proper" is used to designate the fire-pot and space above fire-pot to the opening through to the breeching.

[4] Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147; United Drug Co. v. Ireland Candy Co., 8 Cir., 51 F.2d 226, 231, certiorari denied 284 U.S. 683, 52 S.Ct. 200, 76 L.Ed. 577; Torrey v. Hancock, 8 Cir., 184 F. 61, 70;

ings and specifications are sufficient to cover location of this thermostat in the breeching of the furnace.

Whatever the teachings of the drawings and specification may be, however, the monopoly of the patent is confined by the claims. Claims 1 and 2 locate the thermostat where it will be subject to minimum temperature in the "combustion space above the combustion pot". This refers to that part of the furnace proper which is above the fire. Claim 3 is for location in a "combustion space heated by said combustion pot". The evidence is that the combustion within the furnace proper can be said to be complete therein only when the furnace is operating at high efficiency and that, when not so operated, it is difficult to determine just when combustion is completed—when the furnace is being overfed, combustion has been observed to occur in the stack three or four feet from the combustion pot. Claim 4 covers a minimum temperature of the "combustion space". Claim 5 covers a minimum temperature "within the furnace". Furnace is not defined in the patent but there was testimony that the breeching was regarded as a part of the furnace. Considering what has just been said as to claims 3, 4 and 5, in the light of the revelations of the specifications and in view of what one skilled in the art would know as to the effectiveness of placing the thermostat in the breeching, it would seem that these claims might (in so far as the wording of the patent is concerned) well be construed to cover location in the breeching. The testimony does not justify extension of the claims to the chimney because (as to claims 3 and 4) the evidence is that combustion in the chimney is infrequent and an undesirable, if not dangerous, happening; and (as to claim 5) the evidence does not extend the meaning of "furnace" beyond the connections (usually of no great length in dwellings) between the furnace proper and the chimney.

▮ *File Wrapper.* Where broad claims are denied in the Patent Office and the applicant accepts the ruling of the Office and substitutes narrower claims upon which a patent issues, the patentee is estopped to extend construction of the granted claims to include the matter denied (Keystone Driller Co. v. Northwest Engineering Corporation, 294 U.S. 42, 48, 55 S.Ct. 262, 79 L.Ed. 747; Smith v. Magic City Club, 282 U.S. 784, 789, 51 S.Ct. 291, 75 L.Ed. 707; Moore v. Frigidaire Corporation, 8 Cir., 71 F.2d 840, 846; McKays Co. v. Penn Electric Switch Co., 8 Cir., 60 F.2d 762, 767). Such an estoppel is not, however, based upon the discussion in the Office or even upon statements made, in the Office, by the applicant but rests upon the rejection and substitution of claims. Keystone Driller Co. v. Northwest Engineering Corporation, 294 U.S. 42, 48, 55 S.Ct. 262, 79 L.Ed. 747. Appellant relies upon certain rejection of claims by the Office and also upon certain statements of the Examiner and of the applicant. Under the rule above stated, we consider only the rejection and substitution of claims as the possible basis of estoppel.

As filed, the original application contained five claims. Three of these (claims 1, 2 and 4) had to do with the construction of an automatic coal burning furnace. Two (claims 3 and 5) were concerned with dual thermostatic control of the fuel feed. All claims were rejected and a division required because claims 1, 2 and 4 were for a furnace and referable to another Division of the Office. Claims 3 and 5 (the control claims) were rejected as being an aggregation. Applicant accepted the decision as to division, elected to prosecute upon the control claims and struck out the furnace claims (claims 1, 2 and 4). The Examiner ruled "that as worded" the two control claims were aggregations but pointed out a way to avoid by striking certain expressions which referred to the abandoned claim 1. This change was made. The Examiner rejected these two claims on Gray #1,667,001 and Powers #416,947, saying:

"There is no invention broadly in substituting a dual thermostatic control for the dual control disclosed by Gray, or in controlling the fuel feed instead of the damper in the manner shown by Powers."[5]

---

Simplex Appliance Co. v. Star Can Opener Co., 7 Cir., 37 F.2d 491, 492; Adam v. Folger, 7 Cir., 120 F. 260, 262.

[5] The claims were very broad and as follows:

"3. A furnace, including dual thermostatic control mechanisms adapted to operate the furnace to maintain the dwelling at a predetermined temperature and to prevent extinguishing of the fire when the room temperatures are sufficiently high.

\*　　\*　　\*　　\*　　\*

5. A furnace, including dual thermostatic control mechanisms adapted to operate the fuel feed and force drafts, one

Applicant then added four new claims of the same general character[6] and, seeking to distinguish Gray and Powers, asked reconsideration. The Examiner rejected all of the claims as being inaccurate, functional and indefinite. He cited Schneider #1,275,096, Garrison, #1,386,698, Bosselmann #1,521,669 and Schurtz #1,522,595, "as closely related to applicant's invention" and stated that "In view of them [the cited patents] the case contains some allowable subject matter and applicant should endeavor to present such proper claims as will enable the Examiner to pass the case to issue." The above claims were cancelled by applicant and five new claims introduced. Those claims were rejected as "drawn to an aggregation". Also Teal #1,067,627, Emery #1,234,317, Ousdahl #1,472,280 and St. Clair #1,633,-465 were cited with the statement: "Ousdahl, Emery and St. Clair show thermostats controlling stokers from such positions as to prevent extinguishment of the fire." Reconsideration was asked, the response being entirely devoted to the objection as to aggregation except the statement "The patents to Emery, St. Clair and Ousdahl have all been discussed and differentiated from the present invention." Without more, the patent issued on these claims unchanged.

■ From the above resume of the file wrapper it is clear that all claims finally rejected were of the most general nature— as illustrated by that shown in footnote 5 hereof. There was no approach to a limitation by the Office of the exact location of either thermostat. Hence there is no estoppel preventing a construction of the claims to include the furnace breeching as a location for the fire preserving thermostat.

■ *Prior Art.* While much prior art was introduced, we will confine discussion to such items as are urged in the brief of appellant. These consist of nine patents, three publications and one physical exhibit which illustrates the matter in one of the publications.

Before discussing these citations, it is helpful, in gauging the effect of them, to state certain matters. Appellee makes no claim of novelty as to thermostats or as to use thereof in dwelling rooms to affect the heat therein by controlling the furnace fuel feed. He concedes the use of a dual thermostat control where one thermostat was a room thermostat and the other was located in or about the furnace as a *safety* device to prevent the heat in the furnace becoming dangerously *high*. He concedes that there was one prior device intended to prevent extinguishment of the fire but claims that it operated purely as a *timing* device entirely unresponsive to furnace temperature conditions.

What his counsel argue as being novel and, therefore, the invention, is stated as follows:

"The use of room thermostats antedated this patent many years. They were successfully used with gas furnaces and oil burners because furnaces of that type are equipped with a pilot light which will ignite the fuel. But with coal-burning stoker furnaces, for domestic use, thermostats controlled by room temperature could not be successfully used because in warm or moderate weather, or under any conditions in which the furnace was closed for a considerable period of time, the fire was extinguished, with the result that a reopening of the furnace by a room thermostat, when the temperature dropped below the minimum, would simply start the stoker, clog the furnace with coal, but could not secure heat for the space desired to be heated for the reason that there was no way to renew the dead fire. The fire was out and, therefore, no heat could be secured.

"Coal-burning stoker furnaces could not be used for domestic heating purposes by the use of a room thermostat alone; it was essential that a fire be maintained so that when the room thermostat called for heat for a given space, heat could be secured. This requirement was met by the inventer in the patent in suit by adding a second themostatic control, actuated by predetermined minimum temperature in the furnace. Thus was had a combination of two thermostatic controls, one controlled by the temperature in the space to

thermostatic mechanism functioning by variations in the temperatures of the interior of the dwelling, the other by predetermined minimum temperatures within the furnace."

6 Typical of these added claims is the following:

"A furnace including means to operate the furnace to maintain a dwelling at a predetermined temperature and temperature regulated means to prevent extinguishing of the fire when the room temperatures are sufficiently high."

be heated, and the other controlled by temperature in the furnace, and both contributing to the ultimate object—the furnishing of heat to a given space."

Counsel claim further that:

"It was as the result of this invention that coal stoker furnaces came into use for domestic heating purposes and the same have been favorably received by the public and have been a great commercial success. It is admitted in the record that more than 15,000 of these installations, under this patent, have been had through plaintiff's licensee, Minneapolis Honeywell Regulator Company, and its sublicensee.

"The use for heating of a coal stoker dual thermostatic controlled heating system, as disclosed by this patent, reduced the cost of heating, as compared with oil or gas, from forty to fifty-five per cent.

"It was admitted by the defendant in the trial of this cause that the patent was operable."

The evidence sustains the assertions that the device is operable, useful and economical and is commercially successful. The problem remains as to how far the claimed novelty is affected by the cited prior art.

The patents discussed in the brief of appellant are Powers #416,947, Teal #1,-067,627, Edgecombe #1,138,854, Schneider #1,275,096, Ousdahl #1,472,280, Johnson #1,602,363, Stem #1,882,341, Jones #1,969,136 and Cross #1,758,147.

Powers teaches two diaphragm thermostats—one a room thermostat and the other just above a boiler (presumably located in the basement). Through the medium of air or other fluid, the room thermostat actuates the boiler thermostat which in turn opens and closes the draft damper of the furnace. There is an auxiliary direct operation of the boiler thermostat by steam from the boiler when the water in the boiler reaches the steam stage—this is of the nature of a safety device since the result of the steam action on the thermostat is to close the damper. It is a combination of room temperature and safety devices. The patent does not teach a fire preservation device and, in fact, either the fire would go out unless the room thermostat called for heat or heat would be furnished when not so called for.

Teal is, generally speaking, similar in purpose, principle and effect except that the control of the draft and check dampers is electrical. The furnace thermostat is "suitably located with respect to the furnace" (p. 2, 11. 69-70) and is shown in the drawing to be near and partially in the top side of the furnace.

The object of Edgecombe was to improve the circulation of air in a hot air heating system. This he worked out through thermostatic electrical control of a blower fan and of the furnace dampers. He uses three thermostats—two being room thermostats and one a furnace thermostat. The room thermostats are used, respectively, to control the furnace dampers and to start and stop the blower. The furnace thermostat prevents opening of the draft damper until the furnace casing heat has dropped below the point where the blower cannot circulate the temperature called for by the room thermostat. By this maximum utilization of the furnace heat, he claims to maintain a more even temperature in the house, to economize in fuel, to lengthen the life of the furnace and to reduce the care for operation (p. 1, 11. 26-31). This patent contains no suggestion of a fire preservation device.

Schneider is for an "automatic furnace draft and fuel regulator." His purpose is to maintain "a uniform temperature in the furnace" (p. 1, 11. 14-15) by steam pressure regulation of the fuel feed and of the furnace drafts. The patent covers only a steam or hot water system. No thermostats, in the ordinary meaning, are used. The control centers solely in a steam drum (partially projecting into the fire-pot) which acts upon a piston in the drum, the piston rod actuating mechanism stopping or starting the fuel feed and closing or opening the draft damper. No fire preservation device is suggested and none could have any place because the purpose and plan of the invention are to maintain "a *uniform* temperature *in the furnace*" (italics added). This is the first cited patent dealing with automatic fuel feed but the purpose and action of this control have nothing to do with preservation of a low fire in the furnace.

Ousdahl reveals a somewhat complicated automatic stoker and damper control. This control may be exercised by a steam governed unit in a room or by a room thermostat. The thermostat control is purely actuated by maximum and minimum room temperatures—the function of

any ordinary room thermostat. The patent gives no suggestions of a fire preservation control at low temperatures.

Johnson is concerned with "electrical control mechanism for fuel-oil burners". He uses three thermostats—one a room thermostat, one connected with the steam header of the boiler, and one in the fire-stack. The function of the room thermostat is the usual one of temperature control between determined maxima and minima. The boiler thermostat is a safety device to guard against excess temperature in the boiler. The stack thermostat is a safety device to guard against unusual happenings preventing oil ignition—such as extinguishment of the gas pilot light—and operates to suspend all operation of the furnace until manually restored. Of course, there is no thermostatic control to prevent extinguishment of the fire. The fire is supposed to cease whenever heat is not required by the room thermostat. It is restored or relighted by the pilot light when heat demands of the room thermostat start the oil feed.

In Stem and in Jones the applications were subsequent to that of the patent here involved and the grants were also later. Neither of these patents is owned by appellant and without something more, they are not citable as prior art.

Cross #1,758,147, is urged as well as statements in the file wrapper thereof. This Cross patent was later in application but issued upon the same date as the patent here. The difference between the two patents is in the heating medium and the resultant situations. In the patent here the heating system is for hot air heat, in Cross #1,758,147, the heating system is steam or hot water. The thermostat in #1,758,147 is located in the boiler where it responds to the boiler water temperature. This is a situation not possible in a hot air system where no boiler is present. In one, the problem is boiler temperature while in the other it is furnace temperature.

The three prior art publications urged are a circular of Honeywell Heating Specialties Company and two bulletins of Federal Mercoid Controls. All of these deal with oil burner control where there is no problem of preservation of fire except a pilot light and safety devices to guard against danger if the light is extinguished, if the oil is overfed or if the heat rises too high. The thermostatic controls are purely safety devices.

Consideration of the above cited prior art convinces that it does not limit the scope of this patent so as to make the location of a thermostat in the furnace breeching for fire preservation purposes an element outside the patent scope.

### Aggregation.

The difference between a patentable combination of old elements and an unpatentable aggregation of such has been stated many times by this and other courts. A patentable combination of old elements is "a co-operation or a co-ordination of the elements which, working together as a unit, although mayhap not simultaneously, produces a new or better result". Skinner Bros. Belting Co. v. Oil Well Improvements Co., 10 Cir., 54 F.2d 896, 898. An aggregation of old elements is the placing in "juxtaposition" of old elements "allowing each to work out its own effect without the production of something novel" (Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241, quoted in Gray v. Texas Co., 8 Cir., 75 F.2d 606, 608)—it is a "mere tying together of so many sticks which retain their entirely separate identity of character and function". H. H. Robertson Co. v. Klauer Mfg. Co., 8 Cir., 98 F.2d 150, 155. A comparison of these definitions demonstrates that the acid test is whether the old elements work together to accomplish a useful new result. Reckendorfer v. Faber, 92 U.S. 347, 357, 23 L.Ed. 719; Sachs v. Hartford Electric Supply Co., 2 Cir., 47 F.2d 743, 748; Independent Oil Well Cementing Co. v. Halliburton, 10 Cir., 54 F.2d 900, 906. It is not necessary that all elements be active simultaneously. Dow Chemical Co. v. Williams Bros. Well Treating Corp., 10 Cir., 81 F.2d 495, 498; Independent Oil Well Cementing Co. v. Halliburton, 10 Cir., 54 F.2d 900, 906; Skinner Bros. Belting Co. v. Oil Well Improvements Co., 10 Cir., 54 F.2d 896, 898; Independent Coal Tar Co. v. Cressy Contracting Co., 1 Cir., 260 F, 463, 468. It is necessary that when each acts it contributes to the new useful result. Gray v. Texas Co., 8 Cir., 75 F.2d 606, 610.

Appellant states its contention that the controls here are merely an aggregation as follows: "he merely combined old known elements to regulate the heat in the dwelling and at the same time keep the

fire from going out. He has used nothing more than two thermostats, each responsive at a different location to the temperature produced by combustion to operate the stoker independently of each other to satisfy the individual requirements at each location. Each of the thermostats employed in the Cross patent act in the manner normally expected of thermostats to act under such conditions."

This contention is not well founded. The purpose of the entire heating system was to heat the house. The purpose of the room thermostat was to maintain a temperature between a fixed maximum and a fixed minimum. This thermostat operated through an automatic control of the fuel feed to the fire. Under some conditions of outside temperature—cold weather—this control was all that was necessary. However, other conditions of outside temperature, not unusual in occurrence, would render the room thermostat inactive for the few hours necessary for the fire to die out. When this occurred and thereafter the temperature fell to the point where the room thermostat would become active, that thermostat would not only fail but would result in positive harm by clogging the furnace with fuel fed to a dead fire. It was to meet this condition by keeping a fire always present subject to control of the room thermostat that the furnace fire preservation thermostat was used. While the action of the furnace thermostat was entirely independent of and beyond control of the room thermostat control, yet it acted solely for the purpose of maintaining a condition which would make the room thermostat control always effective so that it could at all times perform its ·function of regulation of the room temperature. Both thermostats had the same ultimate· purpose—control of room temperature between a fixed maximum and minimum. Each contributed, in a different but necessary manner, to accomplishment of that ultimate purpose. Such a result was new and useful. It was a patentable combination instead of a bare aggregation.

### Paper Patent.

Appellant contends that this patent should be narrowly construed because it is a "paper patent". The inference of "paper patent" is drawn from the non-user of a furnace thermostat extending into the combustion pot, which is the construction shown in the drawings and particu-larly described in the specifications. The specifications clearly state the purpose of the furnace thermostat and that it is to be operated by the furnace heat. The effect of that heat to operate a thermostat placed near the outlet of the heat from the fire-pot would be quite evident to one skilled in the art. The exact location in the drawings and particular description in the specifications amounted to no more than the expression of a preferred form. If appellee had placed this thermostat, exactly as shown in the drawings, in his commercial device, it would have been no less an infringement for appellant to locate its thermostat in the breeching. If mechanical skill or mere convenience indicated to appellee the placing of the thermostat in the breeching instead of in the fire-pot, it would be within the teaching of the patent and a similar location by appellant would still be an infringement.

### Conclusion.

The combination is patentable and is not an aggregation. The scope of the patent extends to location of the furnace thermostat within the breeching connecting the furnace proper with the chimney. It is not a "paper patent". The patent is· infringed by appellant. The decree should be and is affirmed.

WOODROUGH, Circuit Judge (dissenting).

I have been unable to find any invention in the patent sued on in this case. The accused automatic heating plant defendant installed in his home does undoubtedly include many elements produced by true invention. It burns slack coal stoked by cleverly devised mechanisms electrically operated and controlled by ingenious little thermostats. One set of the thermostats activates the coal stoker according to the temperature in the rooms, and another thermostat is placed closer to the fire in order to set the stoker going when the fire gets so low that ·it threatens to go out. The more common automatic oil burning furnace with a pilot light is thus intended to be closely approximated. But there is no contention under the patent sued on that the patentee invented any of the mechanisms, devices or appliances that make up the defendant's accused heating plant. They are brought together in an aggregation where each performs the exact functions and none other that their inventors intended. Toledo Pressed Steel Co. v. Standard

Parts, Inc., 59 S.Ct. 897, 83 L.Ed. 1334, U. S. Supreme Court, May 29, 1939. They each and all represent work done by other people.

The most the patentee in this case can say is that he first conceived and applied the idea of using the thermostat to turn the stoker on just before the fire in the furnace gets too low. He discloses no particular study of how hot a fire has to be maintained to ensure its picking up when stoked, and if he had any positive thought where a thermostat had to be put to activate the stoker when the fire threatened to go out, the thought was that it had to be in the fire-pot (in the combustion area).

The accused heating plant of defendant has the fire preserving thermostat in the breeching of the furnace outside the fire-pot and some distance away from the fire. Therefore, to sustain the plaintiff's suit it must be held that the plaintiff has a monopoly on placing a thermostat in any such relation to the fire that the thermostat will function before the fire gets too low to be revived by stoking. The vendors of the thermostat have long advertised to the public that their thermostats may be placed practically anywhere to perform their well known function at any pre-determined temperature. Certainly it is common knowledge that when a mass of live coals ceases to throw out heat the fire is going out. It seems equally obvious that a thermometer placed near it will approximately reflect the condition of the fire. The patentee's suggestion to get a thermostat at the handiest store and place it in relation to the fire so as to activate the stoker at some proper low state of the fire seems to me to have no semblance of invention. It simply repeats the teaching of the thermostat advertisements which fully explain that the devices can be used wherever electric current is to be turned on or off at pre-determined changing temperatures. I do not concur in allowing the plaintiff any monopoly in the furnace which, as I see it, neither includes nor imitates anything invented by him.