GENERAL MOTORS CORPORATION v.
KESLING.

No. 13402.

Circuit Court of Appeals, Eighth Circuit.

Dec. 17, 1947.

---

[1] 15 U.S.C.A. § 1.

Horace Dawson, of Chicago, Ill. (Edwin E. Huffman, of St. Louis, Mo., and Edwin S. Booth, of Chicago, Ill., on the brief), for appellant.

Edmund C. Rogers, of St. Louis, Mo. (Lawrence C. Kingsland and Estill E. Ezell, both of St. Louis, Mo., on the brief), for appellee.

Before STONE, THOMAS and JOHNSEN, Circuit Judges.

STONE, Circuit Judge.

This is an action for damages for infringement of claims 25–29 inclusive of Kesling pàtent No. 2,034,400 (issued March 17, 1936), which covers a vacuum power mechanism for assisting the shifting of automobile transmissions of the selective sliding gear type. From judgment for plaintiff, defendant appeals.

There is no contest over jurisdiction, ownership of patent by plaintiff or amount

of recovery. The issues are the validity of the patent and, if valid, the existence of infringement.

Properly to understand and determine these issues of validity and infringement, it is necessary to know certain matters and helpful to know others. These are (a) the function of an automobile transmission, (b) the kind of transmission here involved, and (c) the use of power in operating such transmission.

(a). Movement of automobiles is caused by the application of power from the engine to the wheels (usually rear wheels) of the car. The transmission is a separate controllable connectible mechanical link between the engine driving power and the driven apparatus of the wheels. Its function is to provide different ratios of engine driving speed to the speed of the driven wheels. It is so constructed that it may entirely disconnect the driving power from the wheel apparatus—a "neutral" situation—or may engage the power and the wheel apparatus to produce the particular speed ratio desired. Usually there are four speed ratios: reverse and three forward (low, second or intermediate and high).

(b). While there have been and are other kinds of transmissions, the industry had, prior to this patent, generally adopted what is known as the "selective sliding gear" type. The conventional form of this type comprises a group of gears on a shaft interposed between the engine driving shaft and the wheels driven shaft. It has a driving shaft constantly geared to a counter shaft and a reverse shaft, and a driven shaft engageable with the driving shaft by engagement of selectable gears of the transmission. The shape of the gear unit is like a letter H. Each leg of the letter carries a slidable gear. When one of these two sliding gears is in use the other is locked against movement. The cross bar (including the junctions with the legs) is the "neutral" zone, in which the engine power is entirely disconnected. One of these sliding gears is connectible with reverse and low speed by sliding the gear forward or backward respectively, while the other sliding gear similarly controls second and high speeds. Thus there is a lateral movement—across the H bar—to select the sliding gear and a longitudinal movement of the selected sliding gear to engage the desired speed ratio cog gear.

(c). Up to Kesling, the only force to operate this type of transmission, which had been successfully used in automobiles, was entirely manual. This was exerted by the driver through a lever projecting from the car floor, or, later, attached to the steering wheel post. Through this lever and its connections with the sliding gears, the driver could, by lateral movement, select that one of the two sliding gears desired and then thereon, by longitudinal movement, the desired speed ratio cog gear.

While cold weather may stiffen the grease on the gears necessitating additional manual force, yet, normally, little physical effort is required to shift properly operating gears of this type. However, possibly because the movement is so frequent but certainly for sales reasons, automotive engineers had long sought a means to perform this gear shifting by power. No power means had gone into practical use on this type of transmission prior to Kesling. Into this situation, Kesling brought his conception of the use of power in shifting gears of the "selective sliding" type.

### Validity.

In its brief, appellant states "As a matter of *mere novelty*, the idea of shifting first by hand and then making the final shift by power is new. * * * Kesling is alone in all the shifter art in using first a manual shift and later opening the valve to bring about a power movement." And again "Appellant does not urge that the patent is invalid for *lack of utility*."

Appellant contends the patent is invalid because: (a) it does not advance the art since it does not solve a real problem in gear shifting; (b) it does not rise above mechanical skill; and (c) it is a "paper" patent.[1]

---

[1] In its answer, appellant pleaded anticipation by certain stated prior patents and prior public usages. That contention is not seriously urged here as a ground of invalidity.

Usually, it would be necessary first to analyze a patent in determining its validity. Here, we think it better, for several reasons, to postpone analysis of this patent until we reach the issue of infringement. One is that the just stated contentions can be readily disposed of without detailed understanding of the patent teachings. Another is that the crux of this case is infringement *vel non* and it tends to clarity of treatment and avoids repetition to examine the patent in connection with that issue.

■■ In examining these contentions as to validity, we bear in mind the situation that validity is a factual matter (United States v. Esnault-Pelterie, 303 U.S. 26, 29, 58 S.Ct. 412, 82 L.Ed. 625) as are, also, the subsidiary matters [2] upon which that ultimate fact depends. Also, there is the heavy burden borne by appellant arising from the presumption of validity (Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983; G. H. Packwood Mfg. Co. v. St. Louis Janitor Supply Co., 8 Cir., 115 F.2d 958, 964) and further strengthened by court findings sustaining validity (Dean Rubber Mfg. Co. v. Killian, 8 Cir., 106 F.2d 316, 318, certiorari denied 308 U.S. 624, 60 S.Ct. 380, 84 L.Ed. 521).

■ (a). The contention that the art is not advanced because no real problem in gear shifting was solved is argued as follows. The real problem in employing power in a gear shift is to reduce the manual effort; Kesling did not reduce but actually increased the manual effort; therefore, his method produced no useful result and added nothing patentable to the art.

The trial court properly found that "relieving the hand burden is the only reason for using power" and that a power shift which did not do this would be unacceptable to the public. It is clear that Kesling *increases* the load of the "initial" hand operation up to point of meshing gears to the extent of the "drag" of the power unit pistons and that he *entirely relieves* the hand from any load in the "final" operation of meshing the gears. Thus there is presented

an opposed loss and gain. Just how serious is this "drag" weight of the pistons is not entirely clear. The parties urge this matter from the position most favorable to each. Appellant treats the matter by beginning the shifting movement from disengagement of gears already engaged and carries it through neutral to the initial engagement of the desired gear. The only measurement (appearing in the evidence) of the effort in such entire movement is that it involves the "peak" of the shift operation effort. Appellee treats the matter beginning at neutral and the testimony (from one of the witnesses of appellant) is that the movement from neutral to initial gear engagement is about one-fourth of the effort from neutral to completion of the mesh with the desired gear. That the use of power in the "final" meshing operation would afford some relief is evident. The crucial matter is whether the balance between these opposed effects is sufficiently serious to affect unfavorably the liking of the public for such a shift. It is not obvious that it would. In the absence of such a compelling situation, the finding of the trial court of novelty must be sustained.

(b) The contention that Kesling did not rise above mechanical skill must be determined adversely. It is clear that the industry had theretofore for many years sought to apply the use of power to gear shifts without success. Such efforts had never produced the combined use of manual and power force, either in sequence or in coaction. The prior efforts had failed because they provided for exclusive use of power throughout the entire shift thus losing the hand control at point of mesh—such control being necessary to avoid "clashing" of the gears about to be engaged. Kesling preserved this hand control through this critical point of the shift and yet used power. This situation cannot overcome the finding of novel patentability and the specific finding of patentability over mechanical skill.

■ (c) Appellant urges that Kesling is a "paper patent" because no such shift-

---

[2] Examples are anticipation by earlier patents (Williams Mfg. Co. v. United Shoe Machinery Co., 316 U.S. 364, 367, 62 S.Ct. 1179, 86 L.Ed. 1537) and invention or mechanical skill. Thomson Spot Welder Co. v. Ford Motor Co., 265 U.S. 445, 446, 44 S.Ct. 533, 68 L.Ed. 1098.

828

ers were ever built. The issue of "paper patent" may appear either as a challenge to validity (Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721; Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 71 F.2d 539, 544; Staude v. Bendix Products Corporation, 7 Cir., 110 F.2d 484, 485) or as a legal reason for constriction of the scope of the patent. Stewart-Warner Corporation v. Jiffy Lubricator Co., 8 Cir., 81 F.2d 786, 793. In either case, disuse is ineffective unless chargeable to the owner of the patent (Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 422, 28 S.Ct. 748, 52 L.Ed. 1122, and see Coltman v. Colgate-Palmolive-Peet Co., 7 Cir., 104 F.2d 508, 511, 512). Whether the owner is so chargeable is a fact matter. The evidence is that Kesling was not a manufacturer of automobiles nor of gear shifts for them; that the Bendix Products Corporation was engaged in making gear shifts and selling them to automobile makers, including appellant; and that during pendency of this patent application, Kesling tried to interest Bendix in this device and submitted this application. Bendix made an interdepartmental examination—the comment of one officer, in submitting the matter to another, was "The device looks as if it had been rather well worked out but I doubt if there is anything in it which would be of interest to us." To this was replied "Commercially these are not interesting at present. Please review from the Patent aspect." Considering the situation thus revealed as to the character of the device as a feature in an automobile, the non engagement in manufacturing of Kesling, the business methods in the automobile manufacturing business of acquiring such devices from other makers thereof, and Kesling's efforts to interest such a maker, it cannot be concluded that lack of commercial use of this shift was due to any fault of Kesling. The specific findings of the trial court that this is not a "paper patent" and should not, for that reason, be narrowly construed must be sustained.

## Scope of Patent.

The first step in deciding infringement of a patent is to determine the scope of the patent, which "is the boundaries (or limits) of the invention protected by the patent" Smith v. Mid-Continent Inv. Co., 8 Cir., 106 F.2d 622, 624. The parties disagree entirely as to the scope of this patent. This disagreement holds much of the crux of this case. In Smith v. Mid-Continent Inv. Co., 8 Cir., 106 F.2d 622, 624, this Court said that the scope of a patent could not be determined in a definite sense but must be sought by the application of certain established principles of patent law, which were the state of the art into which the patent came, the language of the patent and the proceedings in the Patent Office (the file wrapper).

*State of Art.* In applying these principles here we will first examine the state of the art when Kesling came into it with the conception in this patent.

The selective sliding gear type of transmission originated as an entirely manually operated shift. In time, the automobile industry sought means of employing power in the shifting. The incentive and the activity in this search is evidenced by seven patents[3] for which applications were filed in 1916, 1917, 1919, 1923, 1931, and 1932. Besides this activity shown in these patents, the evidence reveals much other endeavor on this line, even to the extent of altering the type of transmission. The controlling purpose of these attempts was to employ power entirely to perform the shifting operation throughout—the hand simply released the power to do the work and, without effort and without control, guided the power controlled mechanism to the desired gears.

All of these attempts failed to solve the problem satisfactorily. A common cause of failure was that provision for the critical step in a shift of this type was overlooked. This step was the moment of initial contact in the meshing of the gears. Except for a partial effect by synchronization in passing

---

[3] Baughn No. 1,223,136, Landis No. 1,-251,246, Brock No. 1,354,948, Spaulding No. 1,533,215, Craig No. 1,665,909, Hopkins No. 1,914,255, Moorhouse No. 1,-993,015.

from second into high speed, each of the gears is revolving independently. Obviously, there can be no proper meshing of the two independently moving gears until their several movements are sufficiently synchronized to allow the teeth of one to enter the teeth of the other. Where shift is attempted of unsynchronized gears, the least result is the familiar and unpleasant "clashing" of the gears and the most is injury to the gears if the shifting force is continued. In the purely hand shift, the driver could detect lack of synchronization (by feeling through the hand lever the presence of the trouble in the gear box), could withdraw his force until synchronization occurred, and then complete the shift. The fatal defects in the all power shift were that it had no "feel" or other method of detecting this gear interference or of halting or of adapting the power pressure to meet the situation. Being insensible, these full power shifts would continue, robot like, to force the gears together whether they were synchronized or not.

Thus, Kesling came into an art seeking to introduce power into selective sliding gear shifting, which art showed only full power devices with no hand control at this critical point of initial mesh. Because of this lack of some efficient control at this critical point in the shift these shifts were fatally defective. The situation was that repeated attempts to use power in this type of shift had been unsuccessful and the uncontrollable use of power throughout the shift had revealed the problem that there must be control of power at this critical point in the shift. Kesling gave the first solution of this problem.

*Language of Patent.* Having set forth the state of the art, our further pursuit of the scope of this patent leads next to the language of the patent. Claims 25–29 inclusive, involved here, are set forth in the footnote.[4] Each of these claims states the physical combination of the various mechanical elements and their functional interrelationship and operation.

Analysis of any of these claims reveals a combination mechanical structure composed of gear shift elements, manually operated elements, power operated elements and an "actuator." The heart of the combination is the actuator. To it, the shift, the manual and the power elements are all mechanically connected. The tie in of the power element is with two parts thereof—the control valve and the piston—with the results that movement of the actuator opens the valve bringing in the power and this power, through movement of the piston, in turn is exerted

---

4 "25. Gear shifting mechanism of the character described comprising gear shifter elements, an actuator mounted for selectively moving said shifter elements, suction mechanism connected to said actuator for operating said actuator to move said shifter elements, a valve controlled by said actuator for regulating said suction mechanism, and other means for initially controlling said actuator.

"26. Mechanism of the character described comprising shifter elements, an actuator for shifting said shifter elements selectively, operating means operatively connected to said actuator for selecting and moving said actuator to shift said shifter elements, additional mechanism operatively connected to said actuator for assisting said operating means in moving said actuator, and a valve controlled by said actuator for regulating said additional mechanism.

"27. Mechanism of the character described comprising selective gear shifting elements, operating means including an actuator engageable to shift said ele-

ments, a power operated device connected to said actuator for moving said actuator to shift the selected element, and power device controlling means connected to said actuator, said actuator operating said power device controlling means.

"28. Mechanism of the character described comprising selective gear shifter elements, operating means including an actuator engageable to shift said elements, vacuum operated mechanism connected to said actuator for moving said actuator, and vacuum control means connected to said actuator in a manner to be operated thereby.

"29. Mechanism of the character described comprising selective gear shifter elements, an actuator engageable to shift said elements, power operative mechanism including a piston and a control valve, means connecting said piston with said actuator for moving the same, means operatively connecting said actuator with said control valve, and manual means connected with said actuator to initially move said actuator."

upon the actuator. Necessarily, manual force must be used to move or to set in motion the actuator to the point where the actuator opens the valve. This is stated in Claims 25 and 29 and must be read into the three other Claims as a necessity. Beyond the hand movement of the actuator to this valve opening point, at least three (Claims 26, 27 and 28) of these five Claims are, in their language, silent as to when correlatively the manual and the power forces are exerted upon movement of the gear shift. In this present important respect, these Claims are broad.

■ Broad as is the language of these Claims, their scope depends upon the discovery revealed in the explanatory Specifications. The Specifications state that the objects of the invention are "to provide a gear shifting mechanism having manual means for imparting the initial movements thereto in shifting operations, and means for utilizing the operation of the engine or motor to impart the final movements to the shifting operations without the application of additional manual force to effect such final shifting movements; to provide a construction whereby the energy or force of the engine or motor will continue to operate or function without interruption until the shifting operation has proceeded to a predetermined extent; to provide a construction and arrangement whereby a complete shifting may be manually performed if desired; and to provide means under control of one of the shiftable elements of the shifting mechanism for positively holding other elements of the shifting mechanism in their unoperated positions while the operating parts of the shifting mechanism are operated to perform their intended functions, and to hold the latter in their operated positions."

Kesling's preferred construction is shown in drawings. Its construction and its operation are fully described in the Specifications. For the purposes of this appeal, it is not necessary to follow the detailed descriptions in the Specifications. An outline of salient features in the construction and operations suffices. The preferred structure shows a driver's handle connected by a shaft (capable of turning and longitudinal movement) to a spindle, mounted upon and rotatable around its own shaft and its lower part constantly meshed by longitudinal teeth with an arcuate segmental cam which cam is also segmentally meshed with the gear shift and also with the power unit piston rod and with the power valve. The operation of this mechanism is as follows. Movement of the handle causes rotation of the spindle which is communicated to the cam causing its rotation. The rotation of the cam acts upon the shifter mechanism and also upon the power piston rod. Continued manual force causes further movements of the shifter mechanism toward the desired gear and of the piston rod toward the power valve. The results of this continued force by hand is that the gear shift gears are shifted to the point of initial meshing; at which time the valve becomes open; the power then takes over and pushes the gears into full mesh. The disclosures of the drawings and the Specifications show that the preferred structure contemplated use of manual force up to and into the beginning of the mesh with the desired speed gear and that, at that point, the vacuum power comes into play; takes over and completes the mesh. What Kesling conceived he had accomplished in his preferred construction was, as he states, that "In each of these shifting operations the vacuum mechanism functions to assist the manual mechanism in the shifting movements of the gear shifter elements and I believe such combinations and operations are broadly new."

■ "Feel". A matter of controversy as to the language of this patent has to do with what is called "feel." "Feel" is the sensation communicated to the hand of the driver when the gears to be meshed come in contact and are not then so synchronized that they will slide into space but, on the contrary, strike teeth ends in the "clash", familiar to all drivers. This "feel" tells the driver what is happening and he then briefly removes the contact until the movements of the two gears has sufficiently synchronized to permit proper engagement.

Appellant presents argument as to this "feel" along two lines: (1) it does not appear that Kesling taught "feel"; and (2) it is speculative whether his preferred structure provided "feel." These arguments

depend upon the teachings or lack of teaching of the patent.

(1). The patent nowhere contains the word "feel." However, the teaching of the patent clearly reveals such when it is read by one skilled in the art. One so skilled would know the problem Kesling was trying to solve. Briefly, that problem was to overcome the defect in all prior attempts to apply power to this style of shift. Prior attempts had been to employ power throughout to do the entire work of shifting. The defect in such method was the insensibility of power to this critical point in the shift when the gears come into initial contact. The skilled person would know that the main reason for Kesling keeping sufficient hand control at this critical point would be to remedy this defect. The skilled person would know the remedy would be ineffective without this "feel." For Kesling to express in the patent this matter of "feel" would be stating what any one skilled in the art would know already. The presence of the appreciation of "feel" by Kesling is necessarily implied. This implication is emphasized by the language of the Specifications describing the operation of the preferred structure and by the language of most of the Claims which bring in the power after the "initial" gear movement or at the "final" movement.[5]

(2). As to the argument as to whether Kesling's preferred structure reveals "feel", little need be said. The most that can be said for appellant is that the evidence was in direct conflict. The trial court specifically found that such "feel" existed.

*File wrapper.* As originally filed, the application contained 20 claims. Claims 1–3 inclusive cover the spindle and some related mechanism but not reaching the power element. Phrased variously—such as "other mechanism"—but not using words denoting use of power, the 17 other Claims all claim the force of this "mech-anism" to be operative in the "final" turning movement of the spindle or in the "final" movement of the shifter elements.[6]

There were successive rejections, amendments of existing Claims and addition of new Claims. The presently involved Claims came in late in the progress of the application through the Patent Office. Until the appearance of these Claims, only one Claim (original Claim 22) had omitted this sequential operation of manual and power force as being manual force for "initial" movements of the gear shift elements and power force for the "final" movements thereof. That Claim set forth "manual mechanism for selecting and imparting the shifting movements to the said gear shift elements, and additional mechanism for *assisting* the said manual mechanism in the said shifting movements of the said gear shifter elements". (Emphasis added).

After rejection of Claims 15–20 and 22–25 (all inclusive) on Moorhouse No. 1,993,015; this original Claim 22 was cancelled; the other rejected Claims were amended and the present Claims 25–29 brought in by amendment as original Nos. 26–30 respectively. As to these new Claims, Applicant stated: "The new claims are presented in view of Moorhouse and said claims include elements combined in a novel cooperative relationship and operating in a novel timed relationship, clearly different from Moorhouse. That is to say, that said claims include manual means for moving the shifter elements initially and vacuum or power means brought into operation later, and after operation of the manual means, and in definite timed relationship to the operation of said manual means to move the parts through their final movements." Claims 26 and 27, now 25 and 26, were rejected and, because thereof, were amended with the purpose (as stated in the answer of applicant) of "bringing in the valve whereby the actuator controls

[5] The evidence is clear and undisputed that, in the understanding of the art, the boundary between "initial" and "final" movements in such gear shift is the point where the gears first begin to enter mesh.

[6] Final turning movement of the spindle is the same as final movement of the shifter elements because such final turn is the final movement of the shifter. It is describing the same thing with reference to the simultaneous effect of the power upon two different elements—the spindle and the shift.

the suction mechanism to cause the suction mechanism to function at the proper time * * *."

**Summary of Scope of Patent.** The scope of a patent is not a mathematical measurement. It is a *conception* reached by consideration of the combined effects of the state of the art, the contributions as revealed in the language of the patent to one skilled in the art, and any limitations imposed and accepted during the progress of the application through the Patent Office. Smith v. Mid-Continent Inv. Co., 8 Cir., 106 F.2d 622, 624.

From its nature, this "scope" must find its expression in general terms —such as "broad" or "narrow." Like other general legal terms—such as negligence or fraud—the practical use of a definition of the scope of a patent comes only in its application to specific cases of infringement. There it is always important and often decisive to know whether the scope of the patent entitles it to a wider or a narrower range of equivalents. Hereinbefore, we have examined the state of the art when entered by Kesling, the language of his patent and the history of his application in the Patent Office. It remains to state the effects of those combined considerations in producing our conception of the scope of this patent.

As to the state of the art. Kesling found the industry struggling to apply power to the selective sliding gear shift but failing because not providing effectively for the critical point in the initial meshing of the gears. The useful result of these attempts was to reveal the problem of power shifting by demonstrating the need to provide for this critical point in the shifting. He discovered and applied the principal that this need could be met by manual control, guided by feel, at that critical point. This element argues for a broad construction of the patent as being a distinctly novel conception in the art of applying power to shifting this type of gear shift.

As to the language of the patent. Each of these five Claims covers an "actuator" to which are mechanically connected manual means of moving the actuator; power

means to be released by movement of the actuator and which, when released, operates to move the actuator; and gear shifting means moved by the actuator. The starting force which moves the actuator to the stage when the valve is opened, bringing the power into activity, is manual.

Possibly but not necessarily, the statement in Claim 25 of "other means for *initially* controlling said actuator" (emphasis added) and, in Claim 29, of "manual means connected with said actuator to *initially* move said actuator" (emphasis added) may be construed to mean that power did not come in until the entrance of the gears into mesh. This may be so because of the use of the word "initially" and because the evidence is that the "initial" stage of the shifting of this type of gears includes and ends with the beginning of the gear teeth into mesh. Be this as it may, there is no such limitation in Claims 26, 27, 28. These three Claims cover broadly manual force up to release of power force with no limitation as to the position of the gear shift elements at the time power comes in.

The statute (U.S.C.A. Tit. 35, § 33) requires that "in case of a machine, he [patent applicant] shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions." The Specifications set out the objects of the invention, the preferred form of structure and what is believed to be accomplished by that structure. Concisely, they teach broadly a combination of manual and power force in this type of gear shifting with power coming in at the critical point of mesh for the purpose of completing the shift, thus utilizing power "to assist the manual mechanism in the shifting movements of the gear shifter elements." These definitions and descriptions in the Specifications and drawings diminish but do not destroy the effect of the definite advance in the art and the breadth of these Claims —particularly Claims 26, 27, and 28. Kesling taught that, to use power in this style of shift, it was necessary to provide hand feel and control at the critical point of

mesh. While he cannot claim all manner of construction which will apply this principle of hand feel and control because of his own expressed limitations of "objects;" on the other hand, because he uncovered this governing principle of the way to solve the problem of utilizing power in such gear shifts and has shown the way he thought to be the best solution, he is entitled to a reasonably liberal range of protection.

As to the Patent Office. These Claims appeared in the answer to rejection of earlier Claims on Moorhouse No. 1,993,-015 and were expressly intended to avoid that citation. Moorhouse seems to be a full power operated shift where the hand was "merely a regulating means for the power device controlling the beginning and ending of its operation and selecting which of the shifter rails shall be operated and in which direction it shall be operated" (Moorhouse, p. 2, lines 42–46). Each of these Claims must be read as requiring some movement of the gear shift elements by the manual means before the power is released. Possibly, Claims 25 and 29 should or may be construed as meaning that the power is brought in right after initial mesh of the shifter gears. The three other Claims contain no definite timing as to entrance of power but do require *some* manual movement of the gear shift elements before power is cut in. At least these three Claims are broad in this aspect.

Our conclusion is that this patent is entitled to a reasonably broad range of equivalents.

### Infringement.

The parties agree that to constitute infringement the accused device must, in a patent sense, accomplish the same result and by the same means and by the same method of operation. Sanitary Refrigerator Co. v. Winters, 280 U. S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147; Montgomery Ward & Company v. Clair, 8 Cir., 123 F.2d 878, 881; McDonough v. Johnson-Wentworth Co., 8 Cir., 30 F.2d 375, 383; Electric Protection Co. v. American Bank Protection Co., 8 Cir., 184 F. 916, 923. There is agreement that, if any one of these requirements is lacking, there is no infringement. Montgomery Ward & Co. v. Clair, 8 Cir., 123 F.2d 878, 881; Electric Protection Co. v. American Bank Protection Co., 8 Cir., 184 F. 916, 923. Appellant contends that its device does not produce the same result nor by the same means nor by the same method of operation.

*Result.* The argument of appellant is as follows: result must be measured by practical results from the standpoint of utility; the practical result sought in applying power force to gear shifting is to lessen the labor of the shifting operation; Kesling does not lessen but increases such labor; appellant lessens such labor by 80 percentum; therefore, appellant accomplishes a different result.

Under the heading "Invalidity" subdivision "(a)", we have hereinbefore examined the utility of Kesling. We there stated that the "drag" of the piston in the hand force operation and the aid by use of power in the final movements of the gear shifting operation presented opposed considerations, the balance between which was not resolved by the evidence, and, since the trial court had found utility, that finding was sustained. As to Kesling, the same situation is here present and must be upheld; which is to say that Kesling has utility in this respect in this field. What Kesling did was to add power force to manual force in order to derive benefit in such use of power over the purely hand shift. To what extent he realized his purpose is not definitely ascertainable from the evidence. That appellant does employ power to greater extent than Kesling and that this extent of use is measured in the evidence (20% manual and 80% power) is clear. The difference between the two is not one of kind of result but one of degree of success in result. Both use manual force and power force to produce a shifting of this type of gears.

*Means.* The cardinal difference in means, as stated by appellant, is that the means to open the power valve in Kesling is mechanically connected to his "actuator" and operated by the movement of the actuator, while appellant operates its valve by means independently and not through any actuator.

In Kesling, hand means are connected to a crank shaft or spindle which is connected to the gear shift means, the power valve control means and the power means piston. It is this spindle with its connections to the gear shift, the valve and the piston which make up the actuator. The hand moves the actuator which movement causes movement of the gear shift and of the valve control means until the valve is opened, after which power takes over further moving the gear shift through the force exerted on the actuator through the piston connected therewith.

In appellant, hand means are connected to a "valve lever" which, near one end, is connected to the valve control means, and, from near its center, has another connection to one end of a "reaction lever;" the "reaction lever" is also connected, at the other end, to the power piston and, a bit off center, to a "shifter lever." Appellant urges that hand movement of the valve lever operates to open the valve before any movement of the shifter lever through movement of the reaction lever—thus admitting power force before any movement of the gear shift.

In any operation of selective sliding gears, the hand of the driver must guide the operation from its beginning up to initial meshing with the desired speed gear. The office of power in such shifting is to remove or to lessen the hand effort in moving the gears from their starting position to completion of the mesh with the desired speed gear. Efforts before Kesling demonstrated that not only must the hand guide the operation but it must *control*, through a sense of "feel", the operation at the critical point of initial mesh with the desired speed gear.

What Kesling taught broadly was that this hand control at the critical shifting point and use of power force in the shifting operation could be accomplished by harnessing hand force, power force and shifting elements together through a focal unit which would produce these desired uses of power and hand control and which he calls an "actuator." His preferred form showed such construction.

The crux of the contention of appellant as to its use of a different *means* is whether its valve control means is an element of what may be properly termed its actuator. If this valve control means is a mechanism isolated from the other control—of gears and of power force on gears—it is not part of an actuator in the sense taught by Kesling, otherwise it is. Appellant's valve control is its "valve lever." This lever not only is connected with and controls the power valve but it is connected also to the "reaction lever" which furnishes the only connection with the power piston and with the gear "shifter lever." Without this "valve lever"—"reaction lever" connection the device could not operate. This connection alone provides the necessary "feel," the continuous hand control over the shifting operation, and provides the sole means for imparting the hand power which is necessary to the entire shift of gears operation. This composite interlinkage of these three "levers" was found by the trial court to be an actuator. This finding is sound.

Kesling's actuator consists of a hand moved spindle or shaft connected by cams and gears with the valve, the piston and the shift gears in such manner as to produce cooperative action resulting in retaining hand "feel" and control past the critical shifting point. Appellant's actuator consists of a shaft connected to links and levers and producing the same desirable results. Cams and gears and links and levers, as well as their functions and operations, are old in mechanics and, within the scope of this patent are equivalents known to skilled mechanics. The finding of the trial court to this effect is sustained.[7]

[7] "A matter not determinative yet pertinent and significant is the situation following. Bendix (the real defendant here) had repeatedly sought a way to apply power to this style of gear shift. Its efforts were unsuccessful. Kesling submitted to Bendix, for business purposes his invention papers. These papers taught the necessity of hand control into the critical point of mesh and revealed Kesling's principle of so mechanically connecting the hand force of the driver, the gear shift elements, the valve control, and the power force that the hand

*Method of operation.* The nub of appellant's position on this issue is stated in its brief as follows: *"By connecting the valve directly to the handle through the valve lever, and providing lost motion between the valve lever and the shifter forks, the cooperation between the parts is entirely different from that found in the Kesling shifter in that the valve is opened before the shifter forks are moved* and in that power is thus first made effective and made to persist throughout the entire operation. This cooperation between the parts prevents sequential or successive shifting movements."

That the "lost motion" in the linkages between the valve lever and the gear shifter lever allows the valve lever to begin moving the valve release means before there is appreciable movement of the shifter lever and, consequently, the gear shifting element seems evident. Just how soon after this beginning of this valve movement, the power becomes effective as a force in the gear shifting operation is not so clear. The evidence is that no vacuum force becomes instantaneously effective upon opening a valve. Here, appellant's power mechanism employs a piston head of the "spool" type with an "undercut portion" of the larger diameters of the spool, thus producing a "delaying action" in the application of the power force when the valve is opened. This uncertainty as to just the instant when power becomes effective is not determinative in view of two matters: (1) the linkage clearance between the three levers can, within manufacturing tolerance, be made great enough to get the effect of power before any movement of the gear shift elements; (2) the only practical effect on the entire operation of bringing on the power in advance of movement of gear shift elements is to have power operative in releasing the detents [8] holding the gears in position at the time the shifting operation is started—in fact, releasing the detents is the first movement in the gear shift elements. The important consideration is that the power does become effective before any pronounced movement of the gear shift elements.

The method of operation of the accused device is as follows. Manual force initiates and continues throughout the entire shift operation. This manual force is first communicated to the valve lever which starts opening the valve port; continued manual

should be able to detect trouble at the critical point of mesh and should have control to take care of the situation there. Inter-departmentally, this material seems to have been seriously examined by Bendix. Bendix thought "The device looks as if it had been rather well worked out but I doubt if there is anything in it which would be of interest to us." However, the papers were sent to its Patent Department with a request to "Please review from the patent aspect." Afterwards, Bendix created the accused device using the same teaching of hand control at critical mesh point and the same principle of mechanical connection of hand force, power force, gear shift elements and valve control as shown in the Kesling papers submitted to and examined by it.

"The Chief Engineer on Vacuum Power Equipment of Bendix was cross examined as follows: 'Why did you go to the composite reactionary lever group that is now used in the Chevrolet shift? A. The reason we did that was because the driver did not have a good idea of where within the shifting range his shift lever was, and where the parts of the transmission were. He had lost the characteristic feel of transmission, including the detent feel and including the ability—or including that part of the feel which enabled him to know when he was in neutral, and in order to obtain that type of feel auxiliary detent had to be placed in the part of the mechanism associated with the finger lever, and then the finger lever portion had to be adjusted with respect to the transmission shifting portion in order that neutral transmission would correspond with the neutral position of the control mechanism. It was simpler to put a reaction lever in the system than it was to go through all this problem of detents. Q. Because this reactionary lever group gave you the feel of the gears? A. That is right, because it gave us that feel not only of the gears but of the detents and the other parts that were being operated and operated against in the transmission. It gave us the complete characteristic feel of the transmission in a reduced magnitude.'"

---

[8] A detent is a small cavity in a shifter member into which a ball is positioned by a spring for the purpose of locking the member in position.

pressure on the valve lever takes up any "lost motion" clearance in the linkage between the valve lever and the reaction lever then causing movement of the reaction lever; still continued manual pressure takes up any "lost motion" clearance in the linkage of the shifter lever then causing the shifter lever to start moving the gear shift elements; power force comes into exertion (through the piston rod connection to the reaction lever) upon the reaction lever and, through linkage, upon the shifter lever at least as early as the beginning of movement of the shifter lever; the combined manual and power force continue the shifting movement to completion or until halted by withdrawal of manual force. The manual force is necessary not only to initiate the entire shifting operation but also continuously until the operation is completed. This is true because of the type of valve which activates the power unit. This is a "follow up" type. This valve is positioned within a hollow piston rod so that, when the valve is opened, the thus admitted power causes the piston to move in the same direction as the valve is moving. If the hand pressure is stopped, the continued movement of the piston will close the valve port. Thus this hand pressure must be continued to keep the valve open and ahead of the piston movement or power force will be cut out. This manual control of the valve gives the driver complete control of the power; so that by continuing sufficient hand pressure, he can keep the valve port fully open, securing full force of the power unit; or by lessening the pressure, he can allow the port to close, shutting off power. It is not out of place to note that an entire gear shift operation is a matter consuming only seconds of time.

Concisely, this method of operation is manual force admitting power force before any consequential movement of the gear shifting elements and, from there on throughout the entire normal gear shifting operation, a unison of manual and power forces with complete control in and mechanical connection with the hand of the driver—permitting "feel"—up to completion of the gear shift.

In Kesling's preferred form, the hand begins and, without aid of power, carries the shifting operation to initial meshing with the desired speed ratio gear; at which point, power comes in and completes the mesh. His power unit is what is known as a "dump valve." The characteristic of a dump valve unit is that, when the valve is opened, the piston moves its full stroke without being controllable.

The difference between these two methods of operation has been aptly described by a witness for appellee. He states that the accused does the work of gear shifting "by a division of forces"—the hand and power acting together to supply the united force—; while Kesling does this work by a "division of portions of the shifter movement"—the hand doing the first part of the operation and the power doing the final part.

It would seem that the accused device meets better the prime purpose of using power in shifting gears because it utilizes power to carry, throughout the shift, 80 per centum of the labor of shifting. On the other hand, Kesling uses no hand power in the final meshing while appellant uses 20 per centum of the force there employed. Even if accused may be the better structure, that is not decisive here.

The question is whether this difference in mode of operation is within the fair scope of the patent. Hereinbefore, we have determined that Kesling is entitled to a reasonably broad range of equivalents because he was first to reveal a structure which would successfully combine hand and power force to allow hand "feel" and control at the critical point in the shifting operation of this type of gear shift. Also, we have determined that the accused device accomplishes this same result and by the same means. Of more force as to the immediate issue are the findings of fact by the trial court that the modes of operation were the same and that the accused device infringes. We must accept these findings unless they are "clearly erroneous". Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199. We

cannot say these findings were clearly erroneous.

### Conclusion.

 Our determinations are that the patent is valid and that the Claims in suit are infringed. The Judgment is affirmed.