**MINNEAPOLIS-MOLINE CO. v. MASSEY-HARRIS CO.**

**Civ. A. No. 3541.**

United States District Court
D. Minnesota, Fourth Division.

Sept. 30, 1952.

Carlsen & Hazle, Minneapolis, Minn., for plaintiff.

Wheeler, Wheeler & Wheeler, Milwaukee, Wis., and Fowler, Youngquist, Furber, Taney & Johnson, Minneapolis, Minn., for defendant.

JOYCE, District Judge.

This is an action for infringement of Ronning et al. Patent No. 2,455,905, issued December 7, 1948 to Minneapolis-Moline Power Implement Company upon an application filed by Martin Ronning and Kenneth M. Keith. Plaintiff is the owner of said patent by virtue of assignment from Ronning and Keith and a subsequent assignment and merger in which it was the surviving corporation. The defenses asserted are noninfringement, anticipation, lack of invention, and that the alleged invention was not in fact a joint invention.

The patent in suit is embodied in a grain combine of the self-propelled harvester-thresher type and relates to an improvement in the "mechanism for feeding and conveying the cut grain from the harvester cutter bar and platform laterally and thence rearwardly onto the conveyor which elevates the crop into the threshing machine." The heart of the invention, according to plaintiff, "lies in providing a grain combine with a retractable finger feeder, located adjacent the juncture of right angularly disposed conveyors, where serious conges-

tion has presented an age old problem, and being operative to positively engaging the grain as it is moved in by the transverse (auger) conveyor, converting the direction of movement to the longitudinal, and then with equal positiveness, will retract the fingers so that the grain can be carried back to the thresher and not be wound upon the feeder or carried forwardly to aggravate rather than eliminate the congestion."

The combine containing the patented construction consists principally of two sections, a harvester section and a thresher section. No details of the latter are here involved and it suffices to state its function as being to separate the straw and chaff from the crop material delivered to it from the harvester. This section is carried in front of the threshing section and consists of a so-called platform or feed table at the front of which is a reciprocating cutter or shear bar extending across the entire width of the harvester. As the machine moves forward a conventional slatted reel divides the standing grain and pushes it against the cutter bar for cutting. The cut grain is received on a smooth steel platform and is conveyed from both sides towards a longitudinal conveyor disposed at the center of the harvester by means of two auger-type conveyors supported only at their outer ends. These augers terminate at opposite sides of the rearwardly moving or longitudinal slatted-canvas conveyor which extends all the way from the cutter bar rearwardly across the platform and thence upwardly toward the thresher to deliver thereto the severed grain which has been fed across the platform from both sides by the auger.

Since the lateral auger-type conveyors do not extend all the way across the feed table or platform, there exists a gap between the ends thereof. Spaced rearwardly and upwardly with respect to this gap and the axis of rotation of the augers, and above the lower inclined portion of the longitudinal conveyor, is a drum-shaped feeder or rotatable cylinder having apertures in its periphery through which steel fingers are extended and retracted as the cylinder rotates. These fingers are mounted or fastened at their inner ends on an off-set shaft so that they will, it is claimed, as they are extended engage both the grain fed centrally by the augers and that cut immediately in front of the feeder drum, and move it rearwardly in cooperation with the longitudinal conveyor. As the grain passes on the conveyor under the feeder drum the fingers retract so that they will disengage from the grain and not carry it back or wind it around the drum.

The claims alleged to have been infringed and the validity of which are here questioned are as follows:

"* * * 1. In a combine, having a harvester and a thresher rearwardly thereof, a conveyor for conveying crop material rearwardly from the harvester to the thresher, a rotary feeder device across the entire width of the conveyor, and cooperating with a rearwardly moving part of the conveyor to assist in moving the crop material from the harvester to the thresher, said feeder device having extensible and retractable crop engaging members, and means for extending the members as they rotate downwardly and thence rearwardly adjacent to and in conjunction with the rearwardly moving part of the conveyor.

"12. In a combine, a harvester part having a transversely operating conveyor, a thresher part rearwardly of the harvester part, an endless longitudinally arranged conveyor connecting the two parts to convey crop material delivered transversely by the harvester conveyor rearwardly to the thresher part, a rotary feeder disposed adjacent to the crop delivery end of the transverse conveyor and adjacent a crop receiving part of the longitudinal conveyor, crop engaging arms projecting from the feeder, means for rotating the feeder in a rearward direction at its underside, and means for alternately extending and retracting the arms as the feeder is rotated, said last mentioned means being operative to maintain the arms extended through the arc of feeder movement in a direction toward the longitudinal conveyor.

"13. In a harvester, a transverse crop receiving platform, a longitudinal conveyor extending rearwardly from the platform to remove crop material therefrom, a transversely operating conveyor disposed over the platform to convey crop material therefrom to the first mentioned conveyor and in a direction substantially at right angles to the feeding direction of the first mentioned conveyor, and a rotary feeder arranged adjacent a forward part of the longitudinal conveyor to engage crop material moved in by the transverse conveyor, said feeder including crop engaging members that are automatically movable with respect to the feeder proper, as the latter rotates, to effectively engage and urge the crop material toward the longitudinal conveyor and then disengage the crop material.

"14. In a harvester, a transverse crop receiving platform, a longitudinal conveyor extending rearwardly from the platform to remove crop material therefrom, a transversely operating conveyor disposed lengthwise of the platform to convey crop material thereover to the first mentioned conveyor, and a rotary feeder arranged adjacent a forward part of the longitudinal conveyor and adjacent the delivery end of the transverse conveyor to directly receive crop material from the transversely operating conveyor and urge it into contact with the longitudinal conveyor, said feeder including a cylindrical element having extensible crop engaging projections, and means for extending and retracting the projections as the feeder is rotated.

"15. In a combine, a harvester part, a rearwardly disposed thresher part, a centrally and longitudinally disposed conveyor for conveying crop material from the harvester part to the thresher part, a pair of harvester part conveyors disposed one at each side of the first mentioned conveyor to move crop material inwardly from opposite · sides thereof, a feeder disposed adjacent the central conveyor and adjacent the inner ends of the pair of conveyors, said feeder comprising a rotatable drum and crop engaging arms slidably projecting from the drum for projection and retraction with respect thereto, and means for projecting the arms as they move in an arcuate direction toward the central conveyor."

From the evidence it appears that the above claims generally describe the conventional harvester structures familiar to the art since but one of the claims places the longitudinal conveyor at the center of the harvester and therefore the remainder of the claims contemplates a structure with a single transverse conveyor feeding to a longitudinal conveyor located at one side. There is the single departure from the conventional structures, and this is common to all the claims, in that there is placed a retractable finger feeder in what plaintiff has termed the critical area of congestion, the area where the grain must make the right angle turn to go up the longitudinal conveyor. The problem of effectively transposing the grain from the transverse to the longitudinal conveyor has apparently long concerned the industry and was one which the varied older prior art feeder devices effectively solved where the combine was operating in normal stands of grain. But plaintiff asserts that troublesome congestion developed when the combine was operating in heavy, wet or tangled grain at higher speeds and it claims to have eliminated this congestion by placing the retractable finger feeders in the area indicated, contending that it has presented a patentable cooperation and combination which clearly support the validity of the claims in issue.

It is defendant's contention that there is no more here than a combination of old elements and that the requirements as to invention are not satisfied where the combination is the result of an exercise of mechanical or engineering skill and was indicated by the prior art, citing cases of General Bronze v. Cupples, 8 Cir., 1951, 189 F.2d 154; J. I. Case Co. v. Gleaner Harvester Corp., 8 Cir., 135 F.2d 553; Alemite Co. v. Jiffy Lubricator Co., 8 Cir., 176 F.2d 444. This leads us then to an examination of the prior art in an effort to determine

what the real merit of the claimed invention is and whether the combination disclosed by the claims in suit constitutes invention thereover.

One of the more pertinent references cited to the patent in suit is that of Millard 2,292,958, issued August 11, 1942. The patent reflects the usual platform and reel which divides and urges the standing grain toward the cutter bar which extends all the way across the platform. The cut grain falls onto the platform at each end of which are rotatably mounted open end augers which convey the cut grain toward the center of the harvester onto a rearwardly moving longitudinal conveyor which extends rearwardly into the thresher. Above this longitudinal conveyor and adjacent to the delivery or open end of the transverse conveyors is rotatably mounted a beater which guides the grain onto and urges it up the longitudinal conveyor. This beater extends all the way across the longitudinal conveyor and is a drum-like affair with crop engaging members in the form of backward sloping wings with serrated outer edges. These members are fixed and are sloped so that they will disengage themselves from the grain as it passes beneath the beater.

■ Reading the claims in suit against the disclosures of Millard 2,292,958, it becomes immediately apparent that Millard is distinguishable therefrom only in the fact that all the claims in suit substitute a retractable finger feeder for the drum beater or feeder of Millard, and all but claim 15 provide for a single transversely operating conveyor. In other words, claims 1, 12, 13, and 14 would also cover a harvester having a single transverse conveyor with the longitudinal conveyor located at one end of the platform. Models of both the patent in suit and of Millard are here before me and though not pretending to be exact reproductions, they do confirm my conclusion that, except for the distinguishing features pointed out, Millard responds to the organization and operation disclosed by the claims in suit. The Board in its opinion considered Millard and while recognizing that it was intended to accomplish some of the same ultimate results, stated that it attained these

results by utilizing a different structure. It then pointed out that the patent in suit utilized a feed drum operating at a suface speed substantially the same as the longitudinal conveyor whereas Millard employed a beater comprising substantially radial wings whose outer edges have a peripheral speed two or more times that of the conveyor. It need only be noted that none of the claims in suit defines or sets out relative feeder or conveyor speeds beyond stating in claim 1 that it cooperates with a rearwardly moving part of the conveyor. Such a description can hardly be said to be sufficiently definitive to meet the requirements of the statute, 35 U.S.C.A. § 33, with respect to the manner in which the alleged invention is to be described so as to distinguish it from prior inventions, particularly where the feature described is claimed to be the subject matter of the patent sought. The specifications do nothing to make the claim more definite, merely stating that a surface speed of the feeder equalling that of the apron was quite sufficient and that the comparative slowness of speed of the feeder was made possible by a construction disclosed by claims not alleged to have been infringed and the validity of which are not in question. Therefore, I do not feel that the language of the claims here in suit directed to the cooperation feature is sufficiently specific or definite to disclose any invention over the prior art. It is also to be noted that plaintiff does not believe excessive speed to be destructive of the element of cooperation between feeder and conveyor for the feeder located in the auger tube of the machine which is accused of infringing the claims in suit rotates at a speed which is two and one-half times greater than the lineal speed of the undershot conveyor.

Another reference, but not cited to the patent in suit, is that of Troeger 796,268, issued August 1, 1905. Defendant's Model No. 21 Combine, illustrated in the publication "Red Tractor Book" for 1941, reveals a close similarity to the Troeger patent and will be discussed together. Except for the distinctions noted hereafter, both respond to and anticipate the general combination revealed by the claims in suit. For the transverse conveyors of the claims in suit

Troeger and the Model No. 21 Combine both substitute two canvas apron conveyors operating inwardly toward a centrally located longitudinal conveyor. In both the longitudinal conveyor is short and in Troeger it is extended or continued by a second conveyor of the belt or apron type passing over rollers to elevate the grain into the thresher. In the Model No. 21 the grain is grabbed by a second conveyor, an undershot affair, and pushed or pulled up a polished metal chute into the thresher. That plaintiff believes the claims in suit are not limited to the slatted canvas longitudinal conveyor is evidenced by the fact that the accused machine does have the centrally located undershot conveyor revealed by Troeger. In place of the retractable finger feeder of the patent in suit Troeger has a force feeding device which consists of a cylinder provided with a series of teeth extending outwardly from the cylinder but inclined backwardly to prevent winding of grain or crop material around the cylinder. In Troeger the rotatably mounted feeder is located "adjacent the crop delivery part of the transverse conveyor and adjacent a crop receiving part of the longitudinal conveyor" as described in claims 12 and 15, and it does appear to be disposed "adjacent a forward part of the longitudinal conveyor" as described in claim 14 if the drawings of the patent in suit are compared thereto. The feeder device in Model No. 21 appears to be in the position of the feeder referred to in the claims in suit. In both No. 21 and Troeger the feeder extends across almost the entire width of the longitudinal conveyor and is rotatably mounted, cooperating with that rearwardly moving conveyor to assist the grain upwardly into the thresher unit. The form of the feeder device in Model No. 21 differs from Troeger in that the former has toothed fixed blades.

Prior to the filing date of the patent in suit defendant's Model No. 21 Combine was modified to replace the transverse apron conveyors with a single continuous auger feeding toward the centrally disposed longitudinal conveyor. The auger tube at the center is provided with serrated or saw tooth type of blades, which act upon the grain cut at the center of the auger tube to press it beneath the tube where it is then grabbed by the undershot conveyor. Combines with this modification were produced as early as 1941 and were sold commercially beginning in 1943. Invention was claimed for this auger conveyor and an application filed in 1942 resulted in a patent grant in 1947, that of Carroll, 2,426,922. The accused structure differs from the Carroll device in that retractable fingers are substituted for the serrated blades in the former.

The Red Tractor Book for 1941 shows yet another combine which is closely allied to the disclosures of the claims in suit. This is the John Deere No. 9 Combine which was manufactured and sold by John Deere Company as early as 1939 under a license from the Gleaner Harvester Company. In that machine an auger feeds the cut grain to the left along the metal platform or feed table. On the end of this auger are blades or paddles which assist the grain onto the rearwardly moving longitudinal conveyor. Positioned above the lower end of the longitudinal conveyor is a rotatable drum type feeder with projecting fingers which cooperates with the conveyor to urge the grain into the thresher. The fingers in this drum feeder are fixed, however. The cut grain is carried by the auger along the back wall of the platform until it reaches the longitudinal conveyor where it encounters a guide finger which deflects it forward over the top of the blades located at the end of the auger tube from where it passes down under the blades and is compressed onto the longitudinal conveyor by the fixed finger feeder and in cooperation therewith carried into the thresher. But for the retractable fingers and the pair of lateral conveyors called for by claim 15, the No. 9 Combine includes all the features of the claims in suit.

Some difficulty was experienced with the fixed finger feeder of the No. 9 Combine because of the inherent tendency of the crop material to wind across the fingers and to remedy this situation detachable wooden strips were provided to cover the teeth when the combine was operating in heavy, wet or tangled grain.

Plaintiff has stated that these and other patents have been concerned with the problem of eliminating the congestion that occurred as the grain was required to make the right angular or ninety-degree turn from the transverse to the rearwardly moving longitudinal conveyor. He relies upon the rule of law that where a problem has been a serious one and of long standing, and has not been solved by those skilled in the art, the presumption of validity in a patent that does solve it, is greatly increased. General Motors Corp. v. Kesling, 8 Cir., 164 F.2d 824. While recognizing this to be the rule, nevertheless I am not persuaded by the evidence before me that plaintiff has by its combination brought its patent within the protection of that rule. Any one of the prior art references which I have discussed have dealt effectively in normal stands of grain with the problem of transposing the grain in the congested area from the transverse to the longitudinal conveyor, and did so by utilizing all the means disclosed by plaintiff's claims in suit except for the retractable fingers. As combines began to be operated at higher speeds in heavy, wet or tangled grain, there arose difficulties because of the tendency of the cut grain to wind itself around or be picked up and thrown back over the prior art feeder devices and thus further increase the congestion. It was to the solution of this additional problem that the only novelty in the claims in suit was directed and this leads us then to examine whether the means adopted constituted invention over those prior art disclosures which have been termed the secondary references.

It is not denied by plaintiff that retractable fingers, per se, were long known in the agricultural art. The only references before the Board of Patent Appeals and the one relied upon by the Examiner in rejecting the patent in suit were those of Innes 1,896,626 and Innes 2,133,143. These were grain pickup mechanisms and included a drum positioned forwardly of a transverse conveyor. The drum operates in a direction opposite to that of the feeder utilized by the patent in suit and contains extendable crop engaging members or fingers which lift the cut grain up and over the drum as it rotates and drops it onto the transverse conveyor, the fingers retracting as the grain is carried over the top. There is not that cooperation between the pickup device and the conveyor that is found in the patent in suit and this is a factor pointed out in the Board's opinion in reversing the Examiner:

"In appellant's organization the feed drum rotates with all of the downwardly projecting arms or fingers 47 moving in the same direction as the conveyor to feed the crop material upwardly to the thresher part. It is our opinion that the substitution of a pickup drum, such as Innes' for the beater of Millard would not result in a structure as disclosed by appellant's."

The patents I have before me convince me that the Board did not have before it that most pertinent and to me the one most persuasive. In view of this I cannot indulge in the presumption that they were not overlooked by the Board but considered and cast aside as not pertinent. The drawing and specifications of Bullock 1,-168,932, a feeding mechanism for ensilage cutters patented in 1916, reveals an almost identically shaped feeder drum positioned above a conveyor. The wall of the drum is provided with a plurality of staggeredly arranged openings through which extend eccentrically mounted fingers provided with bearing sleeves mounted upon the crank within the drum; said fingers working loosely through the openings so that as the drum is rotated the fingers will be forced outwardly so as to engage the material in the trough, and as the same continues to rotate the fingers will recede so as to release the material as the material is advanced toward the usual feed rollers. The drum of Bullock differs from the device of the patent in suit principally in the fact that the latter is described by claims not here involved as having tapered or trunco-conical end portions. The drawings of Bullock reveal that device to cooperate with a rearwardly moving conveyor to facilitate the feeding of the crop material into the cutter of the machine.

Numerous other references showing retractable finger feeders were here in evidence but in view of the parallelism of

Bullock I find no need to discuss these. It suffices to say that retractable finger feeders were long known and in common use in agricultural machines. The element of cooperation between feeder and an underlying conveyor, which the Board held to be new over the prior art, is clearly shown not only in these so-called secondary references, particularly that of Bullock, but also in the references previously discussed. Substituting the retractable finger feeders of Bullock would produce the precise structure called for by the claims in suit, and the feeder would be performing the exact function it had in its old environment and that performed by the old type drum feeders; that is, to turn the grain onto and up the longitudinal conveyor and then disengage its members upon completion of that function. The fact that Bullock does not show a feeder between two conveyors disposed at right angles to each other and that he was not concerned immediately with the problem of congestion caused by grain coming in axially to the feeder on one conveyor and then making a right turn onto a second conveyor is not decisive of the presence of invention. Bullock does show the mechanism designed and operative to prevent winding of the crop material on the drum, and when viewed with the feeders of the prior art devices which I have discussed, the substitution or combination was obvious. The fact that it functions effectively in the new location does not attribute to it some novel and mysterious functional ability that was not inherent in the older devices and for which invention can be claimed. Plaintiff's patentee under cross-examination admits in effect that his device performed the same function as the old feeders but eliminating the problems caused by winding and wrapping:

"Q. A fixed finger at the same point (as plaintiff's device in the patent in suit) would do the same thing, would it not? It would also turn the grain at right angles? A. It would, but it would bring it over the top again.

"Q. In other words, it would cause wrapping if you had fingers fixed on that feeder? A. Yes."

Experts from Deere and Company have testified that use of retractable finger feeders had been known for many years and had been considered by them for use in combines soon after their No. 9 Combine was designed but that the idea was discarded as being too expensive, the No. 9 having been designed to sell at the lowest possible price. I recognize the dangers inherent in the "why-I-thought-of-that-long-ago" type of testimony but the testimony is substantiated by engineering records kept by Deere in connection with their experimental activities. The record here in evidence is a diary for the year 1940 in which a sketch depicts an auger behind a cutting platform with an eccentric or retractable finger drum feeding directly to a cylinder, in much the same manner as the patent in suit. The testimony that the use of such a feeder was discarded as being too expensive is credible when viewed with the fact that the feeder in the patent in suit is a much more complicated and frangible mechanism than the relatively simple older devices and would add more than a few dollars to the cost and maintenance of the combine, a consideration important to the industry at the time the No. 9 was produced. The fact that plaintiff's combine has sold successfully adds nothing to the presumption of validity since it does not appear that this feature contributed in any material manner to this success.

■■■ For the reasons above stated I am convinced that plaintiff cannot claim invention for the combination disclosed by the claims in suit. Insofar as they purport to describe and claim a combination of old elements, operating in some hitherto unfamiliar cooperative relationship so as to produce a new result, they are void because indefinite in that they fail to distinguish between what is claimed from what preceded in the art. The prior art references reveal combinations the elements of which operate in relationship virtually identical to that disclosed by these claims. General Electric Co. v. Wabash Co., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402. In other respects the claims show no invention over the prior art because they

merely modify one element of an old combination in a manner suggested by the art, or substitute therefor, however one may term the change, an element whose use and purpose was long known. Had plaintiff's patentee substituted a feeder in the precise location and identical in every respect to the feeder of the patent in suit except for fixed instead of retractable fingers, there could have been no claim of invention for the modification and the combination would have come within the scope of a number of patents. I cannot see how plaintiff can now claim invention in the face of the teachings of the art with respect to retractable fingers. The combination of old elements into a mechanism involving no new principle and producing no new result is not invention but is merely the exercise of mechanical skill, even though the results produced constitute an advance over the old in utility and efficiency. General Bronze Corp. v. Cupples Products Corp., 8 Cir., 189 F.2d 154; Trico Products Corp. v. Delman Corp., 8 Cir. 180 F.2d 529. I must therefore .hold that Claims 1, 12, 13, 14 and 15 of the patent in suit are invalid for the lack of invention.

Taking the view that I do, it becomes unnecessary to discuss the other issues herein. The complaint will be dismissed and Findings of Fact, Conclusions of Law and Order in accordance with this memorandum may be submitted.